365 So.2d 471 (1978)
Theotis Fontenot LeJEUNE et al., Plaintiffs-Relators,
v.
ALLSTATE INSURANCE CO. et al., Defendants-Respondents.
No. 61748.
Supreme Court of Louisiana.
November 13, 1978.
Rehearings Denied December 14, 1978.
*472 Guillory, McGee & Mayeux, Robert K. Guillory, Eunice, Fuselier, Pucheu & Soileau, L. O. Fuselier, Ville Platte, for plaintiff-applicant.
Durrett, Hardin, Hunter, Dameron & Fritchie, H. Evans Scobee, Calvin E. Hardin, Jr., Baton Rouge, for defendant-respondent.
Stephen A. Berniard, Jr., Raggio, Farrar, Cappel & Chozen, Lake Charles, C. Brent Coreil, Ville Platte, for Danny Glenn Lefleur, third-party, defendant-respondent.
*473 Arthur I. Robison, Allen, Gooch & Bourgeois, Lafayette, for Ins. Co. of North America, intervenor-respondent.
Jack C. Fruge, Sr., Fruge & Vidrine, Ville Platte, for Dixie Auto Ins. Co.
Patrick A. Juneau, Jr., Voorhies & Labbe, Lafayette, for Western World Ins. Co.
L. Lane Roy, Davidson, Meaux, Sonnier & Roy, Lafayette, for Allstate Ins. Co.
Randall Molitor and Mrs. Ivey Molitor, Joe A. Brame, Brame, Bergstedt & Brame, Lake Charles, for Zurich Ins. Co.
J. Nilas Young and Joseph Bradley Ortego, Young & Burson, Ltd., Eunice, for Ivy Fruge Molitor, all defendants-respondents.
TATE, Justice.
This is a wrongful death action. While riding as a passenger in a funeral hearse, the decedent was killed as the result of a collision at an intersection through which the funeral cortege was proceeding. The trial court awarded the decedent's survivors judgment against some of the defendants, rejecting the demands against others, and the court of appeal essentially affirmed. 356 So.2d 537 (La.App. 3rd Cir. 1978).
We granted certiorari, 358 So.2d 956 (La. 1978), principally to consider the following issues: (1) whether a cause in fact of the decedent's death was the negligence of a deputy sheriff in failing to secure properly the intersection through which a funeral cortege was passing; and (2) whether the general employer of a negligent employee, driver of one of the vehicles, remained liable for its employee's tort, despite the circumstance that the employee had been borrowed to perform services for a special employer at the time of the accident. (Also involved are certain other substantial issues of coverage of the policies issued by the insurers of the sheriff's department, of the general employer, of the special employer, and of the driver of the hearse.)
Procedural Context
The collision occurred at the intersection of two rural highways. The vehicles involved were the hearse in which the decedent LeJeune was riding, the driver (Danny Lafleur) of which had failed to stop at a flashing red light; and an automobile being driver by Randall Molitor at a grossly excessive rate of speed on the favored highway. The deputy sheriff (Willie Smith) assigned to escort the funeral procession had failed to secure the intersection, so that vehicles in the funeral cortege could safely proceed, without stopping, through the intersection despite its inhibiting red light.
The widow and children of LeJeune bring this wrongful death action to recover from numerous defendants, principally: (1) Molitor, the driver of the speeding automobile and his insurer; (2) the general liability and the automobile liability insurer of the sheriff's department, which allegedly furnished coverage for the negligence of Deputy Smith in failing to secure the intersection through which the funeral cortege was passing; and (3) the family automobile insurer of Lafleur, the driver of the hearse, and also the insurer of both his general and his special employer at the time of the accident.[1]
*474 The trial court held that the collision resulted from the concurring negligence of Molitor and Lafleur, but it also held that the negligence of Deputy Smith was not a cause-in-fact of the accident. It awarded judgment against Molitor and his insurer and against Lafleur's family automobile insurer, but it denied recovery against all other parties, including the insurer of both the general and special employer of Lafleur.[2] The court of appeal essentially affirmed, although amending the judgment so as to deny recovery against Lafleur's family automobile policy under an exclusion clause.[3]
Facts
The collision occurred at the intersection of Louisiana State Highways 10 and 13, two hard-surfaced rural highways. A funeral procession was proceeding northward on Highway 13. The plaintiffs' decedent, Rolance LeJeune, was the director of Ardoin's Funeral Home of Mamou, Inc. ("Mamou"). He was riding in a hearse driven by Danny Lafleur, an employee of Ardoin's Funeral Home of Ville Platte, Inc. ("Ville Platte"), a corporation distinct from Ardoin's of Mamou. Lafleur was driving in the procession at the direction of his employer (Ville Platte), pursuant to a request by LeJeune. The funeral cortege was led by an Evangeline Parish sheriff's car driven by deputy Willie Smith.
At the intersection where the collision occurred, traffic on Highway 13 (on which the cortege was approaching) is controlled by a flashing red light, requiring vehicles to stop and yield to traffic on Highway 10 before proceeding into the intersection. Traffic on Highway 10 (on which Molitor was approaching) is controlled only by a flashing yellow light, requiring vehicles to proceed with caution into the intersection. When he approached the intersection and the flashing red light, Deputy Smith stopped, looked both ways, saw no approaching traffic on Highway 10, and proceeded across the intersection. He did not stop and secure the intersection with his automobile, nor did he get out of the car to direct traffic so that the funeral cortege could continue safely through the intersection without the need for each vehicle to stop at the flashing red light.
Deputy Smith, 68 years of age, had never before led a funeral procession on this route. He was untrained in the manner in which such a procession was to be escorted, and in the manner in which intersecting avenues of travel should be secured to allow unimpeded travel to a funeral cortege.
The witnesses differ as to whether the hearse driven by Lafleur was the second or third vehicle in the cortege. Upon arriving at the intersection, Lafleur slowed down but did not stop. He observed that the intersection had not been secured by the police escort and that no one was directing traffic, and he could see the flashing red light.
At this point Lafleur also noticed a vehicle being driven by Molitor, proceeding on Highway 10 toward the intersection. Molitor was driving at a grossly excessive rate of speed, and gave no sign that he was preparing to stop at the intersection. Nevertheless, Lafleur drove the hearse into the intersection.
*475 At this point, Molitor's vehicle was about 300 feet from the intersection. Molitor attempted to stop and laid down skid marks for about 154 feet before striking the hearse, a few feet after the hearse had cleared the intersection. Molitor and Lafleur were injured, and LeJeune, the funeral director who was riding in the hearse, was killed.
Issues
The principal issues before us concern:
(1) Whether the negligence of Deputy Smith was a cause-in-fact of the accident;
(2) If so, whether his negligence is covered by either or both of the two liability insurance policies issued to the sheriff's department;
(3) Whether Lafleur's general employer, Ville Platte, is liable for the injuries caused by his negligence in proceeding into the intersection in the face of a blinking red light and after observing Molitor's right-ofway vehicle approaching at unchecked speed. This issue involves a consideration of whether the circumstance that, at the time of the accident Lafleur was a "borrowed employee" of Mamou, relieves Ville Platte of its usual liability for the torts of its employee in performing business duties for it.
(4) What was the effect of Lafleur's status as a "borrowed employee" upon the liability of the coverage afforded Ville Platte (his general employer) and Mamou (his special employer) under a policy with a "fellow employee" exclusion clause.[4]
1. Was Deputy Smith's Negligence a Cause in Fact of the Accident?

The negligence of both drivers undoubtedly contributed to the accident: Lafleur, by proceeding into the intersection under the circumstances; and Molitor, by his heedless approach at high speed, in the face of the amber caution light, towards the intersection until too near to be in effective control of his vehicle.
Both previous courts indicated, although they did not expressly so hold, that Deputy Smith was also negligent in failing to stop and secure this principal intersection to permit safe and unstopping passage of the funeral cortege through it. The previous courts found, however, that Smith's negligence was not a cause in fact of the accident.
A negligent party may not be held liable where his negligence is not a cause in fact of the accidenti. e., where the negligence is not a substantial factor in bringing about the harm. Dixie Drive It Yourself System v. American Beverage Company, 242 La. 471, 137 So.2d 298 (1962); Restatement of Torts, 2d, Sections 431-33 (1965). As noted in the Restatement, factors which may be considered in determining whether the actor's negligence is a substantial factor include "whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm * * *." Section 433(b).
For reasons to be stated, the trial court and the court of appeal applied an incorrect legal standard in determining whether, under the virtually undisputed facts, Deputy Smith's negligence, if any, was not a cause in fact of the collision. Accepting the facts as found by the trial court, it is clear that Deputy Smith was negligent, and that his negligence was a substantial factor in bringing about the collision.
*476 Deputy Smith's duty was to do what was necessary to ensure that the funeral cortege could pass safely through the intersection, despite the automatic signals that designated Highway 10the road the cortege had to crossas the favored highway. The customary method of ensuring safe passage across such a favored highway is to secure the intersection by blocking the favored road with a police vehicle, whose flashing red light would be a signal to approaching traffic that the automatic signal was being superseded.
Molitor, seeing only the amber "caution" light, and seeing the hearse hesitate before entering the intersection, did not attempt to slow or stop his vehicle until it was too late. Even to a cautious driver, a flashing yellow light is only a signal to be on guard, not to stop. To a driver like Molitor, who was driving his vehicle at a grossly excessive rate of speed, the yellow light may have operated primarily as an indication that the traffic on the other highway would probably stop. Regardless of the standard of care being observed by a driver, however, when he sees the flashing emergency lights of a police vehicle ahead of him, and the police vehicle is blocking the road, he will receive the message that he is required to stop.
The trial court and the court of appeal were able to find that Deputy Smith's negligence was not a cause-in-fact of the collision only by an improper application of the so-called "but-for" test of causation.
The trial court found that Molitor failed to reduce his speed when confronted with the caution light. The court of appeal, by pointing out that Molitor did try to stop once he saw the hearse enter the intersectiontoo lateconcluded that the presence of the sheriff's vehicle might not have made any difference.
The conclusion, however, rests on the implicit hypothesis that Molitor would have ignored the police vehicle just as he ignored the caution light. The hypothesis rests on the speculative inference that the presence of a sheriff's automobile, with flashing lights, parked across an intersection does not signal to oncoming drivers the need to stop and a greater need for caution than is represented simply by a flashing amber light. To some extent, the inference relies upon an unjustified assumption that an oncoming driver on the right-of-way highway would approach the amber caution light at an intersection in the same manner, whether he had simply seen from 300-500 feet away a vehicle (the lead vehicle) cross it, or whether instead he was put on notice by a sheriff's vehicle with flashing lights that an uninterrupted flow of vehicles in the cortege would flow through it without pause for the flashing red light facing them.
The fact is that Deputy Smith negligently failed to supersede the flashing lights by blocking the intersection. Molitor saw only the caution light and ignored it. The accident may or may not have happened if (a) Molitor had seen the police vehicle properly parked and designed to warn him of the cortege, or even had taken heed of the caution light and approaching cross-traffic; (b) Lafleur had not misjudged Molitor's speed and unchecked approach toward the intersection, or (c) Smith had stationed the sheriff's vehicle at the intersection or had taken other steps to warn approaching motorists (such as Molitor) on the right-of-way highway of the extra caution required of them and the certain (rather than merely potential) need for a stop, in order to let pass the entire line of vehicles in the funeral procession (as compared with the passage of the intermittent traffic normally to be expected at the intersection, which vehicle by vehicle might probably have been inhibited from entering the intersection by the flashing red light facing them).
All three of these parties were negligent, Molitor, Lafleur, and Deputy Smith. It is true that the accident might possibly have happened anyway if one of the actors was not negligent, but it is equally true that the accident might not have happened except for the negligence of any of these three parties. The negligence of each of the three actors was a substantial factor in producing the situation which resulted in the harm sustained by the plaintiffs' decedent, *477 and there is no substantial reason to absolve the negligence of any one of the three actors as not a cause in fact of the tragic accident.
Nor is there any reason to say that Deputy Smith's negligence was not causative because it consisted entirely in omission, whereas the other two parties were "positively" negligent. See: Dixie Drive It Yourself System New Orleans Co. v. American Beverage Co., 242 La. 571, 137 So.2d 298 (1962); Prosser on Torts, Section 41 at pp. 237-38 (4th ed. 1971). Thus Louisiana courts use the "substantial factor" test, which is similar to the "but-for" test, except that where more than one party's negligence would have cause the collision absent another party's negligence, all are held to be causative. See Dixie Drive It Yourself, cited above, and Prosser, Id., at pp. 238-241.
As Prosser notes, the "but-for" test (that the accident would not have happened but for the defendant's negligence), while it explains the greater number of cases, does not serve as an adequate test for the present situation: "If two causes concur to bring about an event, and either one of them, operating alone, would have been sufficient to cause the identical result, some other test is needed. . . . In such cases it is quite clear that each cause has in fact played so important a part in producing the result that responsibility should be imposed upon it; and it is equally clear that neither can be absolved from that responsibility upon the ground that the identical harm would have occurred without it, or there would be no liability at all." Id., p. 239.
Nevertheless, it is argued that certain indicia of the present facts militate against Deputy Smith's negligence constituting a cause in fact of the accident.
It is suggested, for instance, that Deputy Smith might have observed his duty to secure the intersection by placing his police car on the farther side of the intersection from Molitor's approach. Since such placement would have made Deputy Smith nonnegligent (without allegedly giving Molitor any more notice of the funeral cortege than he already had), it is argued that Deputy Smith's negligence must not then have been causative.
However, the evidence also reflects that Deputy Smith's car was several car lengths ahead of the hearse. The cars in the procession were not proceeding bumper to bumper so as to block out from Molitor any observation of a sheriff's vehicle with flashing lights parked across but on the far side of the intersection. Under the evidence, we cannot conclude that the funeral procession would have obstructed Molitor's view of the emergency flashing lights on the sheriff's vehicle, had it been placed anywhere in the intersection, as it should have been.
It is also irrelevant that the collision actually occurred a few feet beyond the intersection. Molitor, seeing the hearse enter the intersection, tried to stop his vehicle, and laid 154 feet of skid marks before colliding with the hearse. That his car actually left the road it was travelling on, and crossed Highway 13 at a point beyond the intersection, indicates that he lost control when he attempted too late to stop his vehicle. This late attempt to stop, with the consequent loss of control, is precisely the harm that Deputy Smith's placement of his emergency vehicle in the intersection would have been designed to avoid.
Having determined that Deputy Smith's negligence was a cause-in-fact of the collision, we must determine whether the duty breached by Deputy Smith was designed to prevent the type of harm that actually occurred. It might be that a breach of a duty imposed by law, although a cause-in-fact of harm, might not impose legal liability for the harm because the duty was designed to protect some other potential victim, or to protect the same victim from some other harm. See, e. g., Laird v. Travelers Insurance Company, 263 La. 199, 267 So.2d 714 (1972).
The duty breached by Deputy Smith was to secure the intersection in order to give drivers on the favored highway, such as Molitor, warning that the funeral cortege was passing through the intersection, and *478 thus to make it safe for vehicles such as the hearse to ignore the flashing red light. The duty was designed to prevent an intersectional collision involving the funeral procession, with the consequent risk of injuries such as those that killed LeJeune.
Unlike the situation presented in Laird, we are presented here with a plaintiff to whom a duty was clearly owed, and an accident that the emergency lights on Deputy Smith's car, had they been placed in the intersection to deter gross negligence as well as to warn careful drivers, might have prevented. Lingering doubts about whether Smith's negligence actually caused the collision, once it has been determined that causation-in-fact was more probable than not, cannot be permitted to spill over into the duty/risk determination, a question of law. See Laird, cited above; Boyer v. Johnson, 360 So.2d 1164 (La.1978).
2. Is Deputy Smith's Liability for his Negligence Covered by the Liability Insurance Policies Issued to the Sheriff's Department?

In holding that Deputy Smith's negligence was not a cause in fact of the accident, the intermediate court nevertheless further observed that the liability insurers of the sheriff's department could not be held liable, since the sheriff himself was not present, nor was Deputy Smith shown to have been acting in compliance with a direct order of the sheriff in failing to secure the intersection.
This latter observation was based on La. R.S. 33:1433 (1972) as interpreted by us in Foster v. Hampton, 352 So.2d 197 (La.1977). The statute[5] attempts to limit the personal liability of a sheriff (individually) for the acts of his deputies, and Foster concerned only the personal or individual liability of a sheriff for this deputy's acts.[6]
The issue before us does not concern any personal liability of the sheriff. It concerns, rather, whether liability policies issued to cover negligent acts of a sheriff's office and its deputies may be enforced according to their terms, if the negligence of a deputy in the performance of his duties caused injury to another. Neither the cited statute nor Foster are apposite to this issue.
In the present instance, two insurers are sued who had issued liability policies to the "Evangeline Parish Sheriff's Office" as named insured: (a) Western World, which had issued a "Law Enforcement Officers Professional Liability Policy"; and (b) Dixie, which had issued a "Basic Combination Automobile Policy".
(a) Western World's Professional Liability Policy

By the insuring agreement in its Law Enforcement Officers Professional Liability Policy, Western World agreed to "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of negligent acts, errors, or omissions of the insured" within limits of one million dollars. The insured protected by the policy was defined as the named insured (the sheriff's department) and "all paid full and parttime law enforcement officers of the named insured."
Western World's policy clearly applied, unless the coverage of Deputy Smith's negligence is excluded by a clause that the policy does not apply "to bodily injury arising out of the ownership, operation, or use, loading or unloading, of land motor vehicles."
*479 An exclusion clause in a liability policy is strictly construed against the insurer and in favor of coverage, if more than one interpretation is possible. Creole Explorations, Inc. v. Underwriter's at Lloyd's of London, 245 La. 927, 161 So.2d 768 (1964); Stanley v. Cryer Drilling Co., 213 La. 980, 36 So.2d 9 (1948); Couch on Insurance 2d, Section 44:414 (1964). Consonant with this principle, the decisions we could find hold that, where the automobile use exclusion clause is sought to be applied so as to avoid coverage for injuries otherwise covered by a general liability policy, the exclusion clause does not apply where the insured's act is a result of negligence independent of, even though concurring with, his use of an automobile. State Farm Mutual Automobile Insurance Co. v. Partridge, 10 Cal.3d 94, 109 Cal.Rptr. 811, 514 P.2d 123 (1973); United States Fidelity & Guaranty Co. v. Breslin, 243 Ky. 734, 49 S.W.2d 1011 (1932); Assurance Company of North America, 108 Ga.App. 766, 134 S.E.2d 540 (1963); Couch, cited above, Section 44:532.
Accordingly, the exclusion clause in Western World's policy does not operate to exclude coverage of Deputy Smith's negligence leading up to the collision. Although he could and should have used his police car to block the intersection and warn approaching drivers of the dangerous situation, it was not any use or abuse of his vehicle itself that led to his liability. Rather, it was his failure to supersede the automatic traffic signal and warn traffic approaching on the right-of-way highway that a funeral procession was going to pass through it, a function of his duties as law enforcement officer.
The basis of Deputy Smith's liability is his negligent failure to perform this law enforcement duty, the risk specifically insured by Western World's policy. The circumstance that the deputy was to use his automobile in the performance of this duty was incidental to the breach of this law enforcement duty.[7] His liability is not based upon the negligence use of his vehicle, but rather upon his negligence in failing to secure the intersection so as to alert approaching traffic of the danger involved. The damages to the injured victim arose out of the deputy's breach of his law enforcement duties, not from the deputy's use of his automobile.
The judgment must be amended so as to hold Western World, as insurer of Deputy Smith, a joint tortfeasor, solidarily liable with other parties cast in judgment for the decedent's death.
(b) Dixie's Automobile Liability Policy

The Dixie policy contains the following language: "[The insurer agrees] . . . [t]o pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages . . . arising out of the ownership, maintenance or use of the automobile." Subsequent provisions indicate that "the automobile" refers only to automobiles owned or used by the sheriff's department.
In view of our previous determination, we are willing to hold that Deputy Smith's liability did not arise out of the "use" of the automobile, but, rather, out of the breach of his law enforcement duties. This holding may be especially appropriate in the present situation, where one policy (Western World) was designed to cover non-automobile risks and the other (Dixie, the present one) was designed to supplement this by covering automobile risks.
3. Is Lafleur's General Employer, Ville Platte, Liable for His Negligent Acts as "Borrowed Employee" of Mamou?

Lafleur, the negligent driver of the hearse, was an employee of Ville Platte. At the time of the accident, as directed by his supervisor, he was driving a hearse for Mamou. The evidence shows that, as the need arose, these two corporations would lend their employees from one funeral home to another for short periods to assist in funerals of the day.
The plaintiffs sued the Insurance Company of North America ("INA"), which had *480 issued a comprehensive automobile liability insurance policy that had insured both Ville Platte and Mamou as named insureds. The policy covered the liability of each company for the negligent use by their employees of any automobile.
Despite the contrary contention raised in this court, the plaintiffs' pleadings were broad enough to cover INA's liability either as insurer of Ville Platte or as insurer of Mamou or as insurer of both. See, e. g., Third Supplemental and Amending Petition. Tr. 354. Further, these issues were all tried and decided by the trial court. La.C.Civ.P. art. 1154.
In holding that INA was not liable as insurer of Ville Platte, the intermediate court affirmed the trial court's determination that, at the time of the accident, Lafleur had become a "borrowed employee" of Mamou, as subject to the control of Mamou in the performance of his work at that funeral. In so holding, the court cited five decisions, four of which had in fact held the general employer liable for his employee's torts:[8]
In each of these last four cases, the courts pointed out that the general employer had not met the heavy burden of overcoming the presumption that he retained control (and thus remained liable for his employee's tort) and of proving that "the relationship of master and servant which previously existed between the general employer and employee has been suspended, that a new such relationship has been created between the borrowing employer and that employee, and that such new relationship was in existence at the time the accident occurred." Vincent v. Ryder Enterprises, Inc., 352 So.2d 1061, 1067 (1977).[9]
Under the tests (see, e. g., footnote 9) of some of these cited decisions, a strong argument can be made that Lafleur's general employment was not suspended during his temporary duty performing his same duties for Mamou. He was doing so at the direction of his supervisor at Ville Platte and under a standing arrangement between the two corporations to interchange employees during short periods of particular need for the benefit of both corporations. The only "control or direction" exercised by Mamou, the borrowing employee, was to dictate the details of the task essentially assigned to Lafleur by his supervisor at Ville Platte.[10]
On the other hand, under quite similar facts as those in which suspension of the *481 borrowed employee's employment with his general employer was denied (see decisions cited in footnotes 8 and 10), the employee has been held to be a borrowed employee for whose acts the general employer was not responsible, on the ground that the special employer was in control of the work at hand. We note, however, that most of the decisions concern an issue of whether a special employer was liable in tort instead of for workmen's compensation when a borrowed employee was injured,[11] or a dispute between the general and the special employer as to which of the two should pay for damage done by the borrowed employee.[12]
Only two decisions cited to us actually held that the general employer was not liable to a third person injured by his employee while lent to another.[13] These did so by citing cases which, in the main, had only determined the liability inter se between the general and special employer, or the workmen's compensation vs. tort liability of the special employer; or which had, in fact, held the general employer responsible for the borrowed employee's tort by applying the stringent exculpatory test required of a general employer attempting to avoid liability to a third person for damages caused by his employee's tort.
Ultimately, however, we determine that for at least some purposes Lafleur may indeed have been a borrowed employee of Mamou, as working under Mamou's direction at the time of the accident. For instance, Mamou may indeed be responsible for workmen's compensation to him or for his negligent acts to others, arising out of an accident while Lafleur was performing work for Mamou under its supervision.
Nevertheless, this determination should not relieve the general employer of his liability for his employee's negligent acts done in the pursuance of duties designated for him by his employer, in whose pay he continued and who had the sole right to discharge him. This is especially so in the present case, where the employee was loaned out to another in a continuing arrangement between the employers for their mutual benefit.
This court has never decided in a tort case that both general and special employer may be liable for the borrowed employee's torts. However, we have held that both a lending and a borrowing employer are solidarily liable for workmen's compensation benefits to their injured employee. Humphreys v. Marquette Casualty Co., 235 La. 355, 103 So.2d 895 (1958). There, in a swapping-employee situation similar to the present, we held that the general employer cannot be heard to complain that the task was outside the scope of the employee's duties for him, when he had instructed the employee to perform that task for the special employer at whose work the employee was injured.
In B & G Crane Service v. Thomas W. Hooley & Sons, 227 La. 677, 80 So.2d 369 (1965), we held that the general employer could not be held liable to the special employer for damages caused by the borrowed employee in the negligent performance of the special employer's work. However, in related subsequent litigation, we expressly noted the effect of our holding was only that the special employer rather than the general, "as between the two, was liable for the damages resulting from the accident" caused by the negligent employee. Thomas W. Hooley & Sons v. Zurich Gen. Acc. & L. Ins. Co., 235 La. 289, 103 So.2d 449, 450 (1958).
In Lowenburg v. Labor Pool of America, Inc., 296 So.2d 846 (La.App.4th Cir.1974), the court held both general and special employer solidarily liable in tort to a third person injured by the employee's negligent *482 act. The court pointed out that while the borrowed employee was subject to the special employer's supervision and direction while performing work for him, nevertheless he remained in the employment of and subject to direct orders of his general employer, who had ordered him to perform duties for the special employer. We denied certiorari sought by both the special employer, 300 So.2d 191(1) (La.1974) and the general employer, 300 So.2d 191(2) (La. 1974).
In our view, this principle is here applicable. It is consistent with our holding that both general and special employer are solidarily liable to the borrowed employee for workmen's compensation, if he is injured at work for the special employer. Humphreys v. Marquette Casualty Co., 235 La. 355, 103 So.2d 895 (1958). Further, as we have noted, despite the confusion in the jurisprudencein that seemingly indistinguishable facts produce disparate results as to whether a borrowed employee is still subject or not to the control of his general employer so as to have abandoned or not the latter's employment, the jurisprudence almost uniformly has held the general employer liable to a third person for the employee's torts, when that issue has arisen.
A number of other jurisdictions have likewise held that both the general and special employer may be held solidarily liable for the employee's tort.[14] We believe this to be the better rule and, accordingly, overrule expressions indicating to the contrary, as well as the two decisions of the intermediate courts (see footnote 11) which expressly held the general employer not liable to a third person for torts committed by his employee while loaned to a special employer.
We conclude, therefore, that under the circumstances, Ville Platte, the general employer, is liable to the plaintiffs for the damages caused them by Lafleur while negligently driving the hearse for Mamou.
Ville Platte was not sued, howeveronly INA, as the automobile liability insurer of each company. Accordingly, we will next discuss INA's liability, both as insurer of Ville Platte and as insurer of Mamou's borrowed employee, Lafleur. (Since Mamou was the employer of LeJeune (the plaintiffs' decedent), the company itself is not liable in tort for his death while working for it. The plaintiffs' exclusive remedy against that company was for workmen's compensation benefits. La.R.S. 23:1032.)
4. INA Liability PolicyThe "Fellow Employee" Exclusion ClauseEffect of Lafleur Being A "Borrowed Employee".

INA issued an automobile liability policy to Ville Platte and Mamou, naming each as *483 a named insured. The policy covered any liability of the companies and of their employees arising out of use of the listed motor vehicles. The policy limits provided were $100,000 bodily injury for each person. As we read the policy, these limits were provided as to the coverage provided for each named insured as to any person injured.
INA's liability as insurer of Ville Platte for its employee Lafleur's negligence is allegedly excluded by the policy provision that:
"None of the following is an insured:
"1) Any person while engaged in the business of his employer with respect to bodily injury to any fellow employee of such person injured in the course of his employment." (Italics ours.)
The clause does not apply to INA's liability as insurer of Ville Platte itself. Ville Platte is a named insured and was the employer. The clause was not intended to deprive the named insured itself of its insurance protection if one of its employees injured another; the apparent aim of the clause was to prevent an employee of Ville Platte from becoming an additional insured under such circumstances.
The clause further does not apply as to INA's liability as insurer of Lafleur, Ville Platte's employee, as additional insured under Ville Platte's coverage. Insofar as the coverage provided for Ville Platte, Lafleur was its employee; but the decedent LeJeune was employed by Mamou, an entirely different employer. Lafleur and LeJeune were not "fellow employees", insofar as the coverage provided by Ville Platte; for they were not both employed by this named insured. Cf. Pullen v. Employers' Liability Assurance Corp., 230 La. 867, 89 So.2d 373 (1956).
With regard to the coverage afforded to Mamou as a named insured, if Lafleur is an additional insured as Mamou's borrowed employee, then it seems reasonable to conclude, as did the previous courts, that he fell under the exclusion clause as a fellow employee of LeJeune, Mamou's payroll employee:
As the plaintiffs argue, a "borrowed employee" is not necessarily to be defined as a "fellow employee" for purposes of an exclusion clause, given the usual construction of language in insurance policies. This favors coverage and avoids exclusion where the terms are ambiguous or uncertain and may be given two or more reasonable interpretations. We doubt, for instance, that the clause could be used to deny coverage to a payroll employee on the contention that the person injured was a "borrowed" employee and therefore (artificially) a fellow employee.
Here, however, coverage is afforded the tortfeasor primarily because of his status as a borrowed employee. It therefore does not appear to be an unreasonable interpretation or beyond the intent of the policy language to assign him the same employee status for purposes of the policy exclusion clause; especially since the employee is protected for his employment-related tort liability by a coverage in this joint policy afforded him as an additional insured of his general (payroll) employer. Considering the joint policy as a whole, no intent is reflected to afford him protection in the amount of double the policy limits for each named insured.
In summary, INA is liable solidarily with the other tortfeasors, not to exceed its policy limits of $100,000 in all, as the liability insurer of Ardoin's of Ville Platte, Inc., and of its negligent employee, Danny Lafleur.
Conclusion
By the previous courts in this litigation, the plaintiffs widow and children are awarded a total of $156,400.86 against Molitor and his insurer (Allstate); also, the demands against other defendants were rejected, and certain third-party demands were granted or denied, some on the basis of coverage issues decided differently by this court.
In reviewing the quantum, the court of appeal did not consider the plaintiffs' request for an increase, feeling that Molitor's impecunious condition and the small policy limits ($5,000) of his policy could be taken *484 into consideration in making an award; an impecunious condition which may also have affected the trial court's award.
However, we have determined that two insurer defendants also are solidarily liable, within their substantial policy limits, with Molitor and Allstate for the damages here sustained: Western World, as insurer of Deputy Smith; and INA, as insurer of Ardoin's of Ville Platte, Inc., and of its employee, Danny Lafleur. These holdings concerning coverage provided by these additional defendants may not only raise different issues of quantum than were previously considered by the court of appeal, but they may also raise new issues as to matters not decided in the third-party demands which were granted or rejected. We have not been furnished briefs or argument on these issues or on the issue of the apportionment between themselves of the liability of the three insurers cast solidarily, but not to exceed their policy limits, for the concurring negligence of the three tortfeasors, Molitor, Deputy Smith, and Lafleur.
In our ordinary practice, we usually do not attempt to determine issues of a complex nature that the appellate court has not passed upon, especially when they have not been fully briefed and argued in this court. Instead, we remand the proceedings to the court of appeal for that purpose.

Decree
Accordingly, we amend the judgment so as to hold that the Insurance Company of North America and the Western World Insurance Company are solidarily cast, not to exceed their respective policy limits of one hundred thousand and of one million dollars, with the defendants previously cast, i.e., Randall Molitor and the Allstate Insurance Company, for all amounts which may be awarded the plaintiffs upon the remand below. We affirm the dismissal of the plaintiffs' demands against Mrs. Ivy Molitor, the Dixie Auto Insurance Company, and the Zurich Insurance Company, and likewise affirm the dismissals of third-party demands or interventions by or against these parties. We further affirm the allowance of the intervention by the Insurance Company of North America allowing it to claim by preference and priority out of the award sums paid and to be paid as compensation benefits by it arising out of Rolance LeJeune's death.
The trial court judgment, as amended by the court of appeal, is otherwise set aside, and the case is remanded to the Court of Appeal, Third Circuit, for further proceedings consistent with the views expressed in this opinion. All costs, including those in this court, are to be assessed by directions of the court of appeal upon the final determination of this litigation.
JUDGMENT AMENDED, AND CASE REMANDED TO THE COURT OF APPEAL.
SUMMERS and MARCUS, JJ., dissent.
NOTES
[1] LeJeune's widow and children sued for his wrongful death, naming the following defendants: Randall Molitor, the driver of the automobile; Ivy Molitor, his mother, the owner of the automobile; Allstate Insurance Company, the automobile liability insurer of the Molitor vehicle; Western World Insurance Company, the comprehensive liability insurer of the Evangeline Parish Sheriff's Department; Dixie Auto Insurance Company, the motor vehicle liability insurer of the Sheriff's Department; Zurich Insurance Company, the family automobile liability insurer of Danny Lafleur; and Insurance Company of North America (INA), the motor vehicle liability insurer of the Ardoin's Funeral Home of Ville Platte, Inc. and of Ardoin's Funeral Home of Mamou, Inc., two corporations. Several defendants made third-party demands or intervene against other defendants, and several also named the driver Lafleur as third-party defendant. INA also intervened, in its capacity as workmen's compensation insurer for Ardoin's of Mamou, claiming the right to be reimbursed by any parties found liable in tort for workmen's compensation benefits paid by it, and claiming priority over the tort claims of the widow and children.

As noted in the text of the opinion, the trial court found only Molitor, his insurer (Allstate) and Lafleur's insurer (Zurich) liable in the principal action, and granted Allstate and Molitor a right of contribution against third-party defendant Lafleur and his insurer, Zurich. The court awarded damages totalling $156,400.86, and assigned priority to INA for reimbursement of workmen's compensation benefits it had paid. (As noted in the text, the court of appeal upheld the trial court judgment in all respects, except insofar as it found Zurich liable for Lafleur's negligence. The court of appeal found that the Zurich policy did not provide coverage to Lafleur for this collision.)
[2] The trial court's denial of recovery against the insurer was based respectively upon (a) the non-liability of the general employer for the tortious acts of its employee borrowed by the special employer and (b) a "fellow employee" exclusion clause in the special employer's coverage.
[3] The court of appeal held that the funeral hearse was not a "private passenger automobile" so as to be within Lafleur's non-owned automobile coverage. See 356 So.2d 547-48. The court of appeal correctly decided this issue, for the reasons stated by it. We need discuss no further the plaintiffs' assignment of error concerning this issue.
[4] At this point, we note without further discussion, rejecting contrary contentions of the parties, that the following issues were correctly decided by the court of appeal, for the reasons indicated by its judgment: (a) The negligence of both drivers, Lafleur and Molitor, contributed to the accident; (b) Molitor's mother, who had loaned him her car, is not responsible for his negligent use of it; (c) Lafleur's personal automobile liability policy did not cover his negligence while driving the hearse (see footnote 3 above); (d) Mamou's compensation insurer (INA) is entitled under the terms of La. R.S. 23:1203 to priority payment from the judgment against the tortfeasors, in the amount of compensation actually paid by it (i. e., even though such preference primes the tort claims of the major children who received no workmen's compensation benefits).
[5] La.R.S. 33:1433 provides:

"No sheriff of any parish of this state, nor his sureties, shall be liable for any act or tort committed by one of his deputies . . . beyond the amount of the bond or limits of liability insurance furnished by said deputy sheriff, unless said deputy sheriff in the commission of the said act or tort, acts in compliance with a direct order of, and in the personal presence of, the said sheriff . . . ."
[6] See Foster at 352 So.2d 197:

"The statute contemplates personal liability of the sheriff for those acts he personally controls; for such acts the legislature had determined that the sheriff should be answerable. The sheriff is subject to liability up to the limits of the bond or liability insurance furnished by the deputy for the official acts of the deputy which he does not directly control."
[7] In a suit for illegal arrest, for instance, the exclusion clause would not apply, if the deputy unlawfully arrested an individual and had incidentally used an automobile to make the arrest. The victim's damage arose out of the unlawful arrest, not out of the use of the automobile.
[8] The decisions cited below at 356 So.2d 546 are: Vincent v. Ryder Enterprises Inc. et al., 353 So.2d 1061 (La.App.3d Cir. 1977); Highlands Ins. Co. v. L. J. Denny & Son, 328 So.2d 779 (La.App.3d Cir. 1976); Universal Engineers and Buildings, Inc. v. Lafayette Steel Erector Corp., 235 So.2d 612 (La.App.3d Cir. 1970); Kezerle v. Hardware Mutual Casualty Co., 198 So.2d 119 (La.App.3d Cir. 1967); McCutchen v. Fruge, 132 So.2d 917 (La.App.3d Cir. 1961).

All but the last of these decisions in fact held the general employer liable for his employee's tort, although the employee was ostensibly borrowed for a special purpose by another (allegedly special) employer.
[9] This decision pointed out, for instance, that the borrowing employer's personnel "would tell Blackhard [the employee] what to weld, they wouldn't tell him how to weld", and that although they could remove a welder from the job, they couldn't fire him from his general employment. 352 So.2d 1066.
[10] See also: Benoit v. Hunt Tool Co., 219 La. 380, 53 So.2d 137 (1951) (employee of a welding company engaged to do welding for a drilling company was not a borrowed employee of the drilling company, and employees of the drilling company could maintain an action in tort against the welding company); Lowenburg v. Labor Pool of America, Inc., 296 So.2d 846 (La.App.4th Cir. 1974), (action in tort was maintained against both the general employer (who had assigned its employee to a truck-owner for that person to use in his business of leasing trucks) and the special employer, i. e., the truck-owner; since the employee was always subject to the direct orders of his general employer who had assigned him to work for the truck-owner, and since the truck-owner also directed the employee in his work); Berry Bothers General Contractors v. Air Marine, Inc., 328 So.2d 771 (La.App.2d Cir.1976 (pilot supplied by defendant to fly the plaintiff's plane was not a borrowed employee of the plaintiff, since the only control exercised by the plaintiff was to tell the pilot where to fly; therefore, the defendant was liable to the plaintiff for the pilot's negligence); Stafford v. Gilmer, 98 So.2d 522 (La.App.2d Cir. 1957) (sanitarium orderly who was directed by his superiors to go to hospital next door to lift a patient from the floor, where she had fallen out of bed, who was supervised by hospital employees, could not recover in workmen's compensation against the hospital as a borrowed employer).
[11] See, e. g., Miller v. B. Lewis Contractors, Inc., 103 So.2d 592 (La.App.1st Cir.1958); Dixon v. Herrin Transportation Co., 81 So.2d 159 (La.App.2d Cir. 1955).
[12] See, e. g., B & G Crane Service v. Thomas W. Hooley & Sons, 227 La. 677, 80 So.2d 369 (1955); Hislop Plumbing Company, Inc. v. Pgue-Atkins, Inc., 283 So.2d 808 (La.App.2d Cir. 1973); Lambert v. Austin Bridge Company, 189 So.2d 752 (La.App. 1st Cir. 1966).
[13] See, e. g., Commercial Union Insurance Co. v. Bringol, 262 So.2d 532 (La.App.4th Cir. 1972); McCutchen v. Fruge, 132 So.2d 917 (La.App.3d Cir.1961).
[14] See, e. g., Strait v. Hall Construction Co., 26 Cal.App.3d 941, 103 Cal.Rptr. 487 (1972) (in excellent discussion, court relied on workmen's compensation case, similar to Humphreys, cited above, to hold borrowing and lending employers liable for the tort of the borrowed servant); Keitz v. National Paving & Contracting Co., 214 Md. 479, 134 A.2d 296 (1957) ("A person may be the servant of two masters, not joint employers, at one time as to one act, provided that the service to one does not involve abandonment of the service to the other."); Lindenmuth v. Steffy, 173 Pa.Super. 509, 98 A.2d 242 (1953) ("[I]t was proper for the jury to conclude that Steffy was acting in the interests of both Krick and Motor Cargo, and was the agent of both. . . . It is entirely possible, under existing social and economic conditions, for two masters to have control over one servant so as to render both liable."); Gordon v. S. M. Byers Motor Car Co., 309 Pa. 453, 164 A. 334 (1932) (borrowed employee, working for special employer at the direction of his general employer, was acting for both, in that he was performing duties of benefit to his general employer, while complying with specific instructions of the special employer in that latter's work); Vance Trucking Co. v. Canal Insurance Co., 249 F.Supp. 33 (D.S.C.1966) (test is right to control, which may be mutual, especially where employee is transferred to carry on work to the mutual interest of both employers).

See also: 57 C.J.S. "Master and Servant" § 566 at p. 290, footnotes 32 and 33 and pocketparts, in which a number of other decisions from several other jurisdictions are cited to the same effect; 57 Am.Jur.2d "Master and Servant", Section 415 at p. 428, footnotes 1 and 2, decisions cited as to same effect.
See also: Power, It's Time to Bury the Borrowed Servant Doctrine, 17 St. Louis L.J. 464 (1973); Skogland, Borrowed Servants, 76 Commercial L.J. 307, 308-09 (1971); Note, Borrowed Servant DoctrineAllocation of Risk, 5 St. Mary's L.J. 196 (1973).