YELVERTON, Judge.
The plaintiffs in this nighttime single-vehicle accident case, Ricky D. Ledbetter and Boston Old Colony, his collision repair insurer, appeal a trial judge decision rejecting their demands for personal injury and property damages brought against the State of Louisiana, through the Department of Transportation and Development (DOTD). The failure to sign and warn of a sharp curve at a “T” intersection, and strict liability, was the basis of the case against DOTD. The defense was that the only cause-in-fact of the accident was Ledbet-ter’s excessive speed. The trial court ruled that some of the elements of strict liability were present, but that the plaintiffs speed (some undetermined mph slightly over 25, the posted speed limit) was the sole cause of the accident, and that, therefore, Ledbet-ter and his insurer could not recover.
We reverse and award damages. We find the trial judge erred manifestly in finding that the plaintiff’s slight excess speed approaching this unlit and unwarned T intersection at night was the only cause-in-fact of the accident. The fault of the DOTD contributed to the accident. Strict liability applies. Comparative negligence applies. Plaintiff can recover, but his recovery will be reduced in proportion to his fault.
FACTS
Ricky D. Ledbetter was driving his pickup truck on La. 95 in the early morning hours of Friday, October 9, 1981, when he failed to negotiate a 90 degree curve at a T-intersection, ran off the highway, and struck a tree. He and several friends had spent the evening at a dance at Alex Brous-sard’s Ranch located off Old Highway 90. They left the Ranch between 12:30 and 1:00 A.M. and headed back to Lake Arthur. Ledbetter carried two passengers.
Unacquainted with that part of the country, Ledbetter had followed another car to the dance earlier in the evening. They had traveled Interstate 10 to the Duson exit road, La. 95, and had driven south in a straight line on La. 95 from Interstate 10 to Old Highway 90. Returning later that night, Ledbetter looked for and found La. 95, and turned onto it from Old Highway 90, expecting it to take him due north to Interstate 10, back the way he had come. What Ledbetter did not know was that this was a different section of La. 95, and that it would make an abrupt (and unwarned) 90 degree turn to the left a few hundred feet ahead, in order to rejoin that section of La. 95 which he had taken earlier that night.
The point where La. 95 made an abrupt left turn was actually a T intersection, with La. 95 making up the support leg and the west half of the top of the T. The east half of the top of the T was a parish road. The center lines of the north-south segment of La. 95 and the parish road intersected at near right angles. At the top of the T, La. 95 curved from north to west over a short radius of curvature. Inside the curve was a small triangular island of grass and gravel.
There were no advance warning signs or advisory speed signs indicating that there was a curve ahead, nor were there any signs indicating there was an intersection ahead. In fact, except for a 25 mph speed limit sign posted a ways back, the only highway sign along this segment of La. 95 was a route marker, which could not be seen because it was covered by tree branches. It was very dark and there was an occasional patch of fog. The intersection was not illuminated, there were no reflectors on the road and no white lines along the edge of the road, and the center yellow line was so faded that it was hard to see even in the daytime.
Ledbetter testified that earlier he had been traveling 30 to 35 mph until he encountered a patch of fog, at which time he *1037 reduced his speed, and that he was going between 25 and 30 mph when he came upon the curve-intersection. He had been drinking but by all accounts his driving was not impaired; the State Police officer who investigated at the scene put this on his report, and at the trial so testified.
The plaintiff was unprepared for this curve-intersection when he came upon it. His lights were on dim. He said he first noticed a change in the direction of the highway at a point which was later determined to be 150 feet south of the topmost edge of the T. At this point the road made a slight turn to the left, then one road continued straight on ahead to intersect the top arm of the T, while the main road began a curve to the left. When Ledbetter came to the first slight turn to the left, he took his foot off of the accelerator and began to turn left. Seeing the main highway, he attempted to get on it, crossed the triangular patch of grass and gravel, continuously veering left, ran off the highway, and ran into a small tree about 15 feet off of the northern edge of the top of the T. His pickup was heading west when it ran into the tree, and the radius of curvature of his path placed him only a few feet north of where he would have been had he successfully negotiated the curve. He almost made it.
Dr. Davy Bernard, a physicist and accident reconstruction expert, testified that it was Ledbetter’s momentary confusion when he encountered the first, slight turn, then saw one road going straight ahead while another turned abruptly to the left, that caused him to take longer to make a decision than the normal reaction time, causing the curve of the travel of the pickup to have a slightly longer radius than the curve of the highway.
Dr. Bernard’s tests and calculations were based on the path of the pickup truck and all other expert witnesses agreed that Bernard had correctly calculated the path of the vehicle. Bernard’s opinion was that the truck was never out of control, this opinion being based on the physical evidence as well as the testimony of the state police and other eyewitnesses. Based upon all of these factors, Bernard’s opinion was that the critical speed of the pickup was no higher than 29 mph, and that it was more probably 27 mph. This means that the plaintiff was not going more than 27 mph as he attempted to negotiate the curve, and less than 25 mph when he hit the tree.
Larry Harry, the state’s expert, testified that the curve could be negotiated safely at 25 mph and that the critical speed on the curve was more like 29 or 30 mph.
THE TRIAL COURT DECISION
The trial judge in his oral reasons for ruling felt that the entire blame for this accident lay with plaintiff. The trial judge stated that he thought the plaintiff’s speed at the time he hit the tree was 25 mph, but that he had slowed down by then. Blaming plaintiff’s speed as the “one factor that brought all of this about”, the court reasoned that although there was something wrong with the intersection, the state had “rebutted the strict liability rule” by showing that the accident was caused by the negligence of plaintiff.
We interpret these findings to be that two of the elements of strict liability, custody and a defect, were present, but that the third element, causation, was not. C.C. art. 2317.
ISSUES
The four matters for us to decide on this appeal are (1) whether the DOTD’s fault was a cause-in-fact of the accident, (2) percentages of fault, (3) whether plaintiff’s negligence was properly pleaded, and (4) the amount of damages.
1. Was the DOTD’s Fault a Cause-In-Fact of the Accident?
The trial judge in his oral reasons for ruling stated that there was something wrong with the intersection. We agree. The intersection required a 90 degree close turn. Testimony at trial established that there were no reflectors and no white outer road lines along the road and that the yellow mid-road lines were so worn as to be barely visible. The only signs along the *1038 road in advance of this intersection were a speed limit sign at the beginning of the road, and a route marker which was obscured by the tree branches. Duaine Evans, the plaintiffs expert on traffic engineering, testified that the T-intersection was designed as an intersection but was being operated as a curve, and was not signed as either one. These facts support a finding that the intersection presented an unreasonable risk of injury and was therefore a defective thing in the custody of the DOTD.
It is our opinion that the DOTD’s fault played a part in causing the accident to happen, and that the trial court was wrong in finding the sole cause of the accident to be the speed of the plaintiff. We have to ask whether the fault of DOTD was a substantial factor in bringing about the harm, in order to decide whether it was a cause-in-fact of the harm. LeJeune v. Allstate Ins. Co., 365 So.2d 471 (La.1978); Charpentier v. St. Martin Parish School Bd., 411 So.2d 717 (La.App. 3rd Cir.1982). In order to determine whether the failure of the DOTD to properly sign the curve-intersection was a substantial factor in bringing about the accident, we need to ask whether it would be reasonable to expect that better signing might have helped to keep the accident from happening.
Ledbetter’s testimony that he was driving variously at from 25 to 35 mph is supported by the rest of the evidence. Officer Terry Landry, the police officer who investigated the accident, testified there were no skid marks in the area. Dr. Bernard, the accident reconstruction expert, testified that the maximum speed at which the curve could be negotiated without losing control of the vehicle, was 27 to 29 mph. As Ledbetter did not lose control of his vehicle, Dr. Bernard believed Ledbetter could not have been exceeding those limits, and that he was probably going no more than 27 mph. Since Ledbetter’s conduct was close to the standard of ordinary care, it bespeaks that he was paying at least some attention to his driving: his conduct suggests he would have observed signs calling the road hazard to his attention.
The fault of both parties combined to cause the plaintiff’s injury. What caused plaintiff’s accident was that he did not know there was a dangerous curve in time to safely negotiate it. His lack of knowledge was caused in part by his own slightly excessive speed, which gave him less time to react when he became aware of the curve. This was his fault because he should not have exceeded 25 mph, the posted speed limit. But his lack of knowledge was caused in part also by the absence of appropriate warning signs on this road. Considering the evidence that he otherwise had his vehicle under control, and that he was exercising reasonable care, we believe that he would have heeded signs indicating the curve-intersection ahead, had there been such signs, and slowed down. Thus, the absence of warning was a cause-in-fact of the accident. Therefore, the fault of the motorist and the DOTD combined to produce the accident.
2. Percentages of Fault
In a case where the fault of a motorist and the fault of a governing body responsible for warning travelers against unusually dangerous road hazards combine to produce an accident, comparative negligence is applicable. C.C. art. 2323; Veazey v. Parish of Avoyelles, 476 So.2d 1057 (La. App. 3rd Cir.1985).
Our Supreme Court, in the case of Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967, at 974 (La. 1985), gave us guidelines to assist in the determination of percentages of fault.'
“in assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including, (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, *1039 without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.”
Applying these factors to the present case, we believe that the greater percentage of fault should lie with the DOTD. Ledbetter failed to see what he should have seen, and therefore breached the driver’s fundamental duty to maintain a proper lookout. This failure was the direct result of his speed, which he knew was in excess of the 25 mph limit, albeit only slightly. The DOTD must also be charged with knowledge of the dangerous situation created by the lack of warning signs. The risk created by the plaintiff’s conduct was limited to that time and to those persons present at that time. The defendant’s conduct presented a continuing risk to more people, although the risk was present only at night and only to the few travelers unfamiliar with the road. Nevertheless, the highway was the responsibility of the defendant and it had a duty to make the road reasonably safe for travelers. The capacity of the parties to prevent the accident was about equal.
One factor that impressed the trial judge was an unsolicited remark during the testimony of Mr. Harry, concerning the high traffic count on La. 95 compared to but two accidents in three years at this curve-intersection. We believe that the importance given these offhand, unexplained statistics was unwarranted. The traffic count probably had reference to the main, straight traveled portion of La. 95, not the lesser traveled section where the accident happened, and the section where this accident happened was a local road traveled infrequently by strangers. In any event, the dangerous character of the curve-intersection was proved.
After careful consideration, we believe a percentage of 40 attributed to the plaintiff and 60 to the defendant is just and proper.
3. Whether Plaintiff’s Negligence Was Properly Pleaded.
The plaintiff asserts that the trial court made the procedural error of supplying the affirmative defense of victim fault. In response to the plaintiff’s original petition, the defendant alleged that plaintiff’s damages were by his own fault, citing specific negligent acts. By an amending petition the plaintiff alleged strict liability, and the defendant answered with a general denial. Plaintiff’s argument is that victim fault is synonymous only with assumption of the risk, and since assumption of the risk was neither affirmatively pleaded nor proved, the trial court erred in supplying the victim fault defense. Alternatively, the plaintiff argues that if contributory negligence, or comparative negligence, is encompassed by the defense of victim fault, that was an affirmative defense which should have been pleaded in the answer to the second supplemental and amending petition.
As we have found that contributory negligence is a defense in this case, we need not address the failure to plead assumption of the risk, and we find no merit in the contention that the failure to affirmatively plead the plaintiff’s negligence a second time deprives the defendant of a defense to the strict liability allegation. LSA-C.C.P. article 1005 provides that contributory negligence and “any other matter constituting an affirmative defense,” must be affirmatively pleaded. The general purpose of this article is to give fair notice of the nature of the defense, and thereby prevent a last minute surprise to the plaintiff. Mashburn Agency v. Universal Engineering, 451 So.2d 113 (La.App. 3rd Cir.1984). In the present context, it makes no difference whether plaintiff’s negligence is called contributory or comparative; it had to be affirmatively pleaded, and it was. A plaintiff’s negligence in a given case may or may not be an issue. If it is to be an issue, it should be affirmatively pleaded in the answer. It was pleaded in the initial answer, however, and there was no need for the defendant to repeat the facts of plaintiff’s negligence in later answers addressed *1040 to other issues. Furthermore, the plaintiff’s speed and failure to see the curve were thoroughly probed at the trial and no objection was made to that evidence by the plaintiff.
4. Damages.

General Damages

The trial court, because of its finding that Ledbetter was solely at fault, did not reach damages. The complete record is before us and we will decide the damages to which plaintiff is entitled.
We observe at this point that plaintiffs credibility is apparently not questioned in this case. Our study of the record shows he was forthright and candid in his narration of the facts of the accident. We have no reason to believe that his testimony at the damages phase of the trial was any less credible.
Twenty-three years old at the time of the accident, and a journeyman pipefit-ter by trade, plaintiff suffered a cervical fracture with subluxation, or displacement, of the third and fourth cervical vertebrae. He had what is commonly called a broken neck. Dr. Albon Young, a neurological surgeon in Lafayette, operated, fusing together the second, third, and fourth vertebrae with a wire. A bone graft from the patient’s hip was placed over the wired area to assure the solidity of the fusion. He was discharged from the hospital on October 19, 1981, and returned to his home in Longview, Texas, where he wore a hard cervical collar for two and a half months. Following an additional three months of recovery, he returned to work in April of 1982.
Dr. Young explained that what happened to plaintiff was a painful injury, usually causing some degree of compromise of the nerve roots, as well as causing profound muscle spasm in the neck area. After Led-better left the hospital in October 1981, he was not seen again by Dr. Young until May 2, 1984, just before this trial. In the meantime he was seen through referral from Dr. Young by a Dr. Guererra in Longview, but there is nothing from this doctor in the record.
According to Dr. Young, based on his May 2, 1984, examination and history, the patient complained that he tired easily, that he had trouble sleeping on his stomach, and that he needed to take hot showers on his neck. He told the doctor that he had been unable to return to work as a pipefitter and that he was working as a plumber and tolerating that well. Dr. Young said that his neurological examination and general physical examination were normal. There was an excellent fusion. Ledbetter had some complaints of a vague nature relative to discomfort or exercise tolerance, which were reasonable following this injury. He felt that there was some diminution of range of motion because of the fusion but that the permanent impairment would not be greater than 15 percent of the neck, because “everything really works well.” He recognized the possibility of ultimate degenerative changes above and below the level of the fusion, and he believed that the plaintiff’s complaints were compatible with the injury, and that he had probably reached maximum recovery. His tolerance for activity was less.
Although plaintiff himself testified that during the nearly two years between the accident and when he saw Dr. Young for the last time in 1984, hardly a day went by that he did not suffer some pain, strangely there was no mention of pain in the deposition testimony of Dr. Young regarding the May 1984 visit. During the deposition Dr. Young had in his possession a written list of complaints given to him by the plaintiff. He apparently was not asked to address all of these complaints. He did not mention pain.
The only two witnesses to testify in the case concerning the underlying facts supporting damages were plaintiff and Dr. Young.
Based on this testimony we make an award of $50,000 for general damages.

Lost Wages

When plaintiff was able to return to work he tried to resume pipefitting, but *1041 was unable to. He began to work as a plumber, because it was less strenuous, and was a plumber’s helper at the time of trial.
Two economists testified, one for plaintiff and one for defendant. Dr. Herbert Hamilton, plaintiff’s expert, testified that the lost wages computation at the time of trial was $60,231. This calculation was based upon the income tax returns in evidence and the plaintiff’s testimony. He calculated a loss of $408,742 for the plaintiff’s future loss of earnings.
Dr. Roger L. Burford was the expert economist for the State. He apparently entered the case at the last minute and was not able to do a thorough study of the facts. His testimony was based largely on statistical information that he had obtained within a day or two before trial regarding wages paid in various crafts throughout the country. Using this information, he adjusted Dr. Hamilton’s calculations and came up with a figure of $328,805 for the future wage loss. Dr. Burford gave no testimony regarding past wage loss.
We conclude that plaintiff has proved an economic loss according to Dr. Hamilton’s calculations of $468,973.
There were two items of stipulated damages: $7,500 as property damage (of this, it was stipulated between plaintiff and inter-venor, Boston Old Colony, that $4,684 was paid by Boston Old Colony), and $7,107 for medical and hospital expenses. Adding all these damages together, we reach a total damage figure of $533,580. After reducing all amounts by the percentage of Led-better’s comparative fault, the total amount awarded is $320,148.
DECREE
For these reasons, the judgment herein finding plaintiff totally at fault and dismissing his suit at his costs, is reversed. Judgment is rendered in favor of Ricky D. Ledbetter and Boston Old Colony, inter-venor, and against State of Louisiana, through the Louisiana Department of Transportation and Development, for the sum of $320,148, with interest from judicial demand, and all costs in both courts.
REVERSED AND RENDERED.