664 So.2d 470 (1995)
Harold MANUEL
v.
SHELL OIL COMPANY.
No. 94-CA-590.
Court of Appeal of Louisiana, Fifth Circuit.
October 18, 1995.
Order Denying Rehearing December 18, 1995.
*472 Peter F. Liberto, New Orleans, for defendant/appellant Shell Oil Company.
Roger D. Allen, Rufus C. Harris, III, New Orleans, for intervenor/appellee Hollywood Marine, Inc.
Robert E. Kleinpeter, Baton Rouge, Joseph J. McKernan, Baton Rouge, for plaintiff/appellee/2nd appellant Harold A. Manuel.
Before KLIEBERT, GAUDIN and CANNELLA, JJ.
CANNELLA, Judge.
Plaintiff, Harold Manuel, and defendant, Shell Oil Company (Shell) appeal from a judgment in a personal injury case involving exposure to benzene concentrate, a toxic chemical. Shell appeals from the denial of its request for a jury trial, liability and damages. Plaintiff appeals from the award of damages. We affirm because defendant failed to timely perfect its jury request and the trial judge was neither manifestly erroneous in her liability finding nor did she abuse her discretion in her award of damages.
Plaintiff, born on April 28, 1949, had been employed in various jobs on the Mississippi River for fifteen years. As a tankerman, he was allegedly overexposed to benzene concentrate in 1986 and 1987. From February 1986 to April 27, 1987, his last work day, he was employed by Hollywood Marine as a field representative, supervising the loading of benzene concentrate by other tankermen at the Shell facility in Norco, Louisiana. Shell sent plaintiff to its dock to supervise the tankermen to insure the safe hookup and disconnection of benzene loading equipment, including vent hoses, to oversee the safety of the tankermen on duty, to provide the tankermen with knowledge of benzene concentrate and to eliminate safety problems that might arise.
Several months prior to leaving Shell, plaintiff began to experience flu-like symptoms, headaches, dizziness, chills and nausea. On April 27, 1987, he went to Oschner Clinic because of these continuing symptoms. At that time, he was hospitalized and diagnosed by Dr. Velma Campbell with toxic hepatitis, toxic encephalopathy, mild organic brain syndrome, bilateral polyps in the maxillary sinuses, anxiety and depression. Chemical exposure was noted as the cause of the injury. Following the hospitalization, plaintiff returned to work for a three day period when he worked in the office of Hollywood Marine. He did not return to work as a tankerman or field supervisor.
Plaintiff filed suit against various parties, including Shell, in April 1988 and requested a jury trial. In two supplemental petitions, plaintiff reiterated his request for a jury trial. On November 26, 1991, the trial judge recused himself and was replaced by Judge Mary Ann Vial Lemmon. The case continued to be designated as a jury trial. On November 13, 1992, the case was set for trial. However, the trial judge did not fix the amount of bond to cover the jury costs and did not fix the time to file the bond, as required by La.C.C.P. art. 1734(A). On February 1, 1993, Shell filed a motion and Rule to Show Cause requesting the court's approval to file a cross-claim against plaintiff's employer, Hollywood Marine, based on contractual indemnity. No action on the motion for cross-claim was taken, nor was the order to set bond or costs ever signed.
At another hearing on a unrelated motion held February 17, 1993, the trial judge noticed that the jury trial requirements had not been ordered nor fulfilled. As a result, plaintiff stated that he would withdraw his jury request. During that discussion, the trial judge stated that since no jury trial was perfected, plaintiff did not have to file a *473 written withdrawal. At the same hearing, the trial judge noted that defendant failed to pay costs for the cross-claim motion and that it was too late to hold a hearing on the Rule to Show Cause because the trial was to be held within the following two weeks.
The next day, defendant filed a motion for a jury and jury order and posted a cash bond. The trial judge denied the motion because it was not timely filed. Defendant filed for writs to this court and we denied the writs stating that, on the showing made, we found no error. Writs were not sought in the Supreme Court since the writ denial from this court was allegedly received by defendant on the first day of trial.
Prior to the beginning of trial, all of the parties, except Shell, were either dismissed or settled with plaintiff. The case went to trial against Shell on March 8, 9, 10, 11, 12 and 15, 1993. A judgment in favor of plaintiff was rendered on November 10, 1993. The judgment was amended on February 2, 1994 pursuant to a Motion for New Trial. In the judgment, the trial judge awarded plaintiff a total of $1,023,466.22, as follows:
PAST MEDICAL EXPENSES: $52,542.79 (Counseling by Dr. Gorman $5,170.00; Treatment by Dr. Anastasio $21,124.29; Prescription Medicine $2338.10; New Medico Rehabilitation $23,910.40);
FUTURE MEDICAL EXPENSES: $98,053.00 (Future Medical Monitoring$31,630.00; Future neurological testing$31,630.00; Future psychiatric consultations $34,793.00);
PAST LOST WAGES: $185,636.00
FUTURE LOST WAGES: $409,705.00
GENERAL DAMAGES: $250,000
MEDICAL EXPENSES PAID BY HOLLYWOOD MARINE: $27,529.43
The trial judge denied plaintiff's claim for exemplary damages. She awarded Hollywood Marine, the intervenor, $139,925.97 for past Longshore and Harbor Workers compensation and medical benefits.
DEFENDANT'S APPEAL
On appeal, defendant asserts ten specifications of error. The first four relate to the denial of the request for a jury trial. Errors five and six assert that the trial judge erred in finding causation because she applied the wrong standard and because she erred in her credibility determinations. Error seven contends that plaintiff judicially admitted a chemical incident with another company which was the cause of his injuries, if any. Error eight relates to damages and error nine to the finding that plaintiff was not comparatively negligent. In error ten, defendant contends that the trial judge erred in refusing to allow the cross-claim against the employer and in failing to assess any percentage of fault against the employer.
In plaintiff's appeal, he requests an increase in general damages and an award for exemplary damages. Also, plaintiff contends that he is entitled to attorney fees and costs on the amount awarded to the intervenor as their proportionate share of the litigation costs, pursuant to Moody v. Arabie, 498 So.2d 1081 (La.1986).
DENIAL OF JURY
Defendant asserts that it was unconstitutionally and unfairly denied a jury trial. Defendant argues that it should not be penalized because the trial judge neglected to set the bond or costs and a date for that to be paid, or because plaintiff failed to do what he should have done. Defendant asserts that the Louisiana Code of Civil Procedure allows an opposing party ten days to perfect a jury request, if plaintiff fails to pay the ordered costs or provide an ordered bond. It cites the various codal provisions, which do not provide for the situation in which the order for costs or bond is never issued. See: La. C.C.P. arts. 1733, 1734, and 1734.1.
Plaintiff responds that this issue was decided on the writ and is now the law of the case. He next argues that defendant is required under the code to perfect the jury according to the requirements set forth there, which implicitly means it cannot rely on the other party.
Under C.C.P. art. 1733, 1734 and 1734.1, the court sets the bond or deposit for costs when the case has been set for trial. Plaintiff perfects his jury request by filing a bond or depositing costs according to the order of the court. In this case, the district court en *474 banc established Rule X regulating the time and amount of the costs to be paid before a jury request is honored.[1] Those provisions, in effect, are the "order" of the court.
When the moving party fails to perfect the jury request by complying with the deadlines set out in the district court rules, or in an order of the court, any other party has ten days to file a jury request and that ten days begins to run from the expiration of the time period given to the moving party to pay the costs and/or bond. See: La.C.C.P. art. 1734.1. La.C.C.P. art. 1733C, which provides ten days for the other party to file a jury request after the moving party withdraws his request in writing, only comes into play after a jury request has been perfected by the original moving party. We hold here that it is incumbent upon a non-moving party, who is interested in obtaining a jury, to monitor the record for timely compliance by the moving party. He cannot rely, as conveying to him future jury rights, on the incomplete request of a party who only moves for a jury and does not complete what he requested.
A multitude of things happen before a party perfects his request for a jury. Section D of Rule X states that the jury venire must be chosen thirty days prior to the beginning of the trial. Section E. 1 states that $84 is to be deposited upon receipt of the jury order. Section E.2 provides that another $300 per day for the estimated number of trial days is to be paid seven days prior to trial. In addition, the request for a jury trial must contain, in the order, the language of the Section E.1 and E.2, establishing costs and fees, the deadlines to pay those amounts and estimated number of trial days. Section G specifically states that no jury trial will commence without compliance with Rule X.
In this case, Section E.1 and parts of Section E.2 were not complied with by plaintiff. Consequently, neither were the provisions of the Code of Civil Procedure, articles 1733, 1734 and 1734.1. Thus, the jury request was not perfected timely. Therefore, plaintiff did not obtain a jury trial and his time expired under the various Rules. According to the Court Rules, defendant then had ten days from the expiration of plaintiff's time period to file its request for a jury. The expiration of plaintiff's time period occurred before February 17, 1993, the day on which it withdrew its jury request. It is an obligation of defendant herein, individually, to apply for the jury timely. Since defendant failed to do so, the trial judge did not err in denying defendant's request for a jury trial.

CAUSATION
On the merits of the appeal, defendant does not contest the trial judge's determination that Shell was negligent. It contends that plaintiff failed to prove that defendant's conduct was the cause-in-fact of his alleged injuries. In its fifth, sixth and seventh specifications of error, defendant complains that the trial judge relied on the incorrect standard of proof, that she erred in her credibility choices and that she erred in her causation determination by not considering plaintiff's judicial admission of an intervening event occurring ten days before plaintiff entered Oschner Clinic.
Defendant asserts that the trial judge erred in applying the "reasonable possibility" test to find that plaintiff's injuries were caused by toxic exposure to benzene concentrate. Defendant contends that the plaintiff was in poor mental health before the "exposure" and was unable to show an "accident." Thus, he does not meet the requirements of the presumption of disability set forth in Housley v. Cerise, 579 So.2d 973, 980 (La. 1991).
Plaintiff asserts that the trial judge did not rely on the "reasonable possibility" standard, but used the "preponderance of the evidence" standard to find causation. In addition, plaintiff asserts that defendant mischaracterizes plaintiff's cause-in-fact position and the test for causation. In addition, plaintiff asserts that he is not required to show that the exposure at Shell was the sole cause of his injuries. Rather, plaintiff argues that he need only show, more probably than not, that his exposure was a substantial factor leading to the injuries, citing Thomas v. Missouri Pacific Railroad Co., 466 So.2d *475 1280, 1285 (La.1985); Breithaupt v. Sellers, 390 So.2d 870, 873 (La.1980); LeJeune v. Allstate Insurance Co., 365 So.2d 471, 475 (La.1978); Vonner v. State through Dept. of Public Welfare, 273 So.2d 252, 255 (La.1973); and Dixie Drive It Yourself System New Orleans Co., Inc. v. American Beverage Co., 137 So.2d 298, 302 (La.1962).

1) Legal Analysis of Causation:
Plaintiff has the burden of proving every essential element of his tort case, including cause-in-fact, by a preponderance of the evidence. Lasha v. Olin Corp., 625 So.2d 1002, 1005 (La.1993). Proof of an element may be direct or circumstantial. Id. The evidence is sufficient to constitute a preponderance, when, taking the evidence as a whole, the fact or causation sought to be proved is more probable than not. Id. In this regard, defendant takes his victim as he finds him and is responsible for all the natural and probable consequences of the tortious conduct. Id. Furthermore, cause-in-fact is found when defendant's conduct was a substantial factor in the injury; it need not be the sole cause. Fisher v. River Oaks, Ltd., 93-677 (La.App. 5th Cir. 3/16/94); 635 So.2d 1209, 1214; Thomas, 466 So.2d at 1285; Breithaupt, 390 So.2d at 873; LeJeune, 365 So.2d at 475; Vonner, 273 So.2d at 255; and Dixie Drive It Yourself System New Orleans Co., Inc., 137 So.2d at 302. In addition, the Louisiana Supreme Court in Housley, 579 So.2d at 980, reiterated previous jurisprudence holding that:
[a] claimant's disability is presumed to have resulted from an accident, if before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, providing that the medical evidence shows there to be a reasonable possibility of causal connection between the accident and the disabling condition. (Emphasis added.)
2) Evidence of Causation:
Plaintiff testified that he worked as a tankerman for different companies over the years on the river. In 1980, working to secure a barge from a storm, he was injured in a fall when lightning hit the barge. He suffered broken ribs, abrasions and water in his lungs from falling into the river. He was seen at that time by both Dr. Roger Anastasio, a psychiatrist, and Dr. Cornelius Gorman, a vocational rehabilitation counselor. He eventually was able to return to work.
In 1985, plaintiff stated that he was discharging a sealed barge when he felt disconnected and intoxicated. He went to the Veteran's Hospital, where he told them that he was exposed to benzene.
In 1986, plaintiff was hired by Hollywood Marine as a field representative for loading benzene concentrate at defendant's dock. Plaintiff's job as field representative was to supervise the Hollywood Marine tankermen in the loading of benzene concentrate (also called pyrolysis gas by defendant). The evidence showed that the concentrate was loaded through a hose from the dock to a sealed barge. Following the completion of loading, which could take ten to fourteen hours, the excess benzene concentrate was drained into a sump. At the time plaintiff worked on the Shell dock, the sump was uncovered. During the loading, any escaping vapors from the product were vented into a vent barge. From there the vapors were vented into the atmosphere. When the loading was completed, the vapors were "pulled" and the valve system was closed. Because the benzene in the product is a hazardous and toxic chemical, operations were shut down when odor from the product could be detected, when leaks were found in the seals, when there was mechanical failure or when there was a leak in the pipeline. Wind conditions affected the shut-down. If there was no wind to disperse the vapors, the operations were stopped because the heavier-than-air vapors would sink to ground level, endangering the workers. Testimony of various witnesses and documentary evidence showed that there were often complaints from the community of benzene odor emissions, which also shut the operations down.
Although plaintiff was not required to actually perform the hook-up and disconnect functions, he and his relief, Beniot Landry, stated that plaintiff would often assist in the *476 work. Plaintiff stated that he had to be there for these operations because those were the times that spills or leaks from the connections could occur. During the actual pumping of the product, it was not necessary for him to be there and there were times that his employer would send him back and forth between defendant and other companies.
Around April 17, 1987, Hollywood Marine sent plaintiff to check on one of the chemical barges that was being repaired by another company. The barges have a double hull and the inside hull had developed a leak. While there, plaintiff was ordered to go into the barge to check to see if the tear was fixed, despite his protests, before it had been certified free of chemical vapors. In testimony plaintiff stated that the particular barge was being used to transport natural gas, whereas in his deposition he said it contained benzene concentrate. Plaintiff testified that he used one of the other company's air masks, wore a rain suit, rubber boots and gloves. Plaintiff stated that he only went down three rungs of the ladder, looked around and came back up. In his deposition, however, he stated that he stayed down for ten minutes and that he "pulled vapors". At trial, plaintiff stated that he was sick at the time with a cold and fever. Plaintiff explained the discrepancies between his deposition and trial testimony by claiming that he was deposed for sixteen hours, was tired and on medication.
Plaintiff was responsible for taking injured workers to the hospital and did so in December 1986 when another worker was overcome by benzene vapors. In that same time frame, plaintiff began to experience one cold after another. Because he was unable to shake-off the flu-like symptoms, he was sent to Oschner Clinic on April 27, 1987. Following his admission, the company also sent him to a lung center in Texas. Plaintiff stated that after the Oschner Clinic visit, he tried to go back to work in the office for three days. However, driving became extremely stressful for him. Even now, he becomes upset when he has to drive and he had to drive to go to work. He testified that he was later given medication ordered by Dr. Anastasio which has calmed him. In this regard, plaintiff stated that he involved Dr. Anastasio in 1987 because he was not coping. The doctor then sent a letter to Hollywood Marine stating that plaintiff was disabled.
On cross-examination, plaintiff admitted that he lied on his employment application with Hollywood Marine about not having had any accidents at work and in a few other statements. In 1989, plaintiff had an automobile accident in which he hurt his ankle. He stated that screws were placed in the ankle at that time. He also stated that he did not inform Dr. Kilburn about the ankle screws. It was also shown that he made inconsistent statements in his deposition.
Plaintiff noted that he was married and divorced to the same woman, does not drink alcohol normally and read about benzene when he was working at the defendant's dock. He admitted that he told people that he went through the eleventh grade in school, when he only finished the sixth grade, and that he told others that he was a Marine Corps helicopter pilot in Vietnam, when he was actually honorably discharged after a short period due to an eye problem that was later repaired.
Safety gear was required to be worn during loading when connecting and disconnecting the pipeline or when there was a leak or when the vapors could be detected by smell. The safety gear included a vinyl rainsuit and respirator. The respirators were supplied by Shell and were not fit-tested to each worker.
Defendant's employees, Guy LeBlanc, the on-site industrial hygienist, and Richard Green, Jr., the field shipping supervisor, testified that on two occasions plaintiff was reprimanded for not wearing his respirator when on the barge during loading. However, plaintiff insisted that he always wore his respirator when it was required and disagreed that LeBlanc ever reprimanded him for not wearing it.
Benoit Landry testified that he trained plaintiff in his job and acted as a relief for him. He stated that plaintiff was a hard worker, who was concerned about the job and the company, always wore his safety gear when it was required and basically made sure everyone did his job.
*477 Plaintiff's expert in respiratory protection, Darill Bevis, an Industrial Hygienist with many years of experience and teaching in this area and involvement with the National Institute for Occupation Safety and Health and the Occupational Safety and Health Association, stated that self-contained air-respirators are recommended for benzene workers, rather than the air-purifying type used by defendant and provided to plaintiff because the air-purifying types are notorious for leaking. He noted that benzene is a carcinogen. Bevis participated in the present formulation and has been involved in the pending revision of the emission standards. He stated that the type of respirator provided by defendant to plaintiff contains a cartridge which needs to be changed when it becomes saturated. However, because benzene has poor warning signs for exposure, it is not recommended for this type of chemical. In fact, he concluded that the use of the wrong respirator was dangerous because the workers would have a false sense of safety, causing them to extend their exposure time. Furthermore, Bevis testified that proper respirator use requires on-going training, fit-testing the respirator to the worker, an inspection and maintenance program and continuing monitoring of the workplace to determine the proper respirator for the condition. None of those recommendations were followed by defendant. Yet, failure to fit-test, in particular, would increase plaintiff's chances of unknown exposure to the benzene because the face masks can leak if the mask is not fitted to the face of the user.
Bevis noted that both the atmospheric vapor discharge and the open sump were areas of potential excess exposure. Although he recognized that defendant declared in its documents that the odor threshold was 1.5 parts per million (ppm) and the exposure maximum was 10 ppm, the lowest odor threshold ever found in the studies was 3 ppm and the newest research shows a mean level of 97 ppm. The odor threshold is important because, once it is detected by smell, the acceptable level of exposure has been exceeded. Bevis also noted that the olfactory sense can become desensitized to odor after frequent exposure. He recognized that the defendant conducted area and personnel monitoring, but believed that defendant should have provided the proper safety procedures nonetheless. He stated that the flu-like symptoms reported by another worker during the period that plaintiff worked at the dock were consistent with toxic exposure. He also opined that defendant was grossly negligent and showed a conscious disregard for the safety of the workers.
The testimony showed that during the time of plaintiff's employment, the permissible emission concentration for benzene concentrate under the OSHA standards was 10 ppm. However, Frank Parker, III, plaintiff's other expert Industrial Hygienist, explained that the industry knew in the 1940's the toxic nature and potential long-term effects of benzene and that the evolution of the exposure limits went from 25 ppm in 1975 to 5 ppm in 1988. He stated that the odor threshold (the level at which the benzene can be smelled) will vary according to the olfactory abilities of the individual. His studies showed the average range to be from 60 ppm to 97 ppm. It must be in excess of the emission standard to be detected. At that point, the individual is already over-exposed to the toxic chemical.
Parker reviewed defendant's community complaint records from June 1986 through April 1987 showing at least four instances that the levels exceeded the standard during the loading process. He reviewed defendant's Quality Assurance Document, the Marine Terminal Operations Manuel and Material Safety Data (MSDS) sheets and concluded that the percentage of benzene in the concentrate was significantly under-reported in the manual and MSDS (15%-20% versus 35%-75%). The documents also showed that defendant was aware in 1981 that air-borne concentrations could be exceeded during loading. Parker stated that, although defendant performed area monitoring and personnel monitoring, it did not monitor the levels in the area often enough and it never monitored the contract workers, including plaintiff, who were in a particularly vulnerable position. The monitoring figures that were reviewed showed a range of exposure levels from under 1 ppm to over 600 ppm. Parker concluded that the variations were due to the *478 wind, whether operations were being conducted, spills, etc. He also stated that plaintiff would be exposed more on the dock during hook-up and disconnection because the excess was being vented into the atmosphere. Notably, respirators were not required on the dock.
Parker agreed with Bevis that plaintiff was provided with the wrong type of respirator. He noted that in one instance reported by a tug worker, the worker's complaints of dizziness, nausea, headache and disorientation were classic for benzene exposure. The exposure level was over 500 ppm that day, and plaintiff was reported as working that day. Parker concluded that, considering defendant's knowledge of the excess levels, the toxicity of the product, its under-reporting, its failure to provide sufficient safety gear and respirator training, defendant had failed to exercise reasonable care for plaintiff's safety.
Dr. Kaye Kilburn, a medical expert in internal medicine, occupational medicine and toxicology, has studied over 2500 patients with organic brain damage. He examined plaintiff and administered neurotoxicology tests to distinguish between nervous system damage from chemicals as opposed to psychiatric illness. He also reviewed plaintiff's medical records, noting that the medical records from Oschner Clinic showed that plaintiff was diagnosed upon admission with toxic hepatitis, toxic encephalopathy with mild organic brain syndrome, bilateral polyps in the maxillary sinuses, probably resulting from sinusitis and anxiety and depression related to toxic hepatitis and mild organic brain syndrome.
Dr. Kilburn administered physiological tests showing plaintiff's reaction time to be three times slower than normal, abnormal balance and abnormal color vision. Dr. Kilburn noted that exposure to solvents often results in abnormal color vision in the yellow-pink ranges, as in plaintiff's response. In the cognitive tests, plaintiff was severely impaired. Plaintiff was also slower than normal in the perceptual motor function tests. His memory was normal, but was abnormal in reading and visual recall. The results of his affective/emotional state test indicated that he has low vigor and anger, but high tension, anxiety, depression, fatigue and confusion. His physical exam was normal except for a mild elevation in blood pressure. On cross-examination, Dr. Kilburn was questioned about plaintiff's history of exaggerating his educational level and his tenure in the Marine Corps. Dr. Kilburn stated that such actions do not change the physical results.
Considering plaintiff's history and test results, Dr. Kilburn testified that plaintiff sustained severe neurophysiologic and neuropsychological impairment by exposure to chemicals when loading benzene. He stated that not everyone who is exposed to chemicals gets organic brain syndrome. However, he noted that plaintiff's history of flu-like symptoms and "musty-headedness" are frequent manifestations of chemical effects. Also consistent was the diagnosis by Dr. Velma Campbell at Oschner of toxic hepatitis because the chemical causes enzyme and fatty changes in the liver. He stated that plaintiff has an increased risk of cancer, leukemia and lymphomas and that the stomach, lungs, brain and kidneys can also be affected. Dr. Kilburn testified that plaintiff's condition was caused neither by any other physical illness nor by any psychiatric illness. Dr. Kilburn concluded that plaintiff requires medical monitoring every six months for life.
Dr. Brian Dolan, plaintiff's second expert in internal medicine and occupational medicine, is also well-qualified, experienced and involved in matters pertaining to toxic chemical studies on a national level. He reviewed the medical records, depositions, defendant's industrial hygiene monitoring records, the community complaints and the literature on the subject. He did not examine plaintiff because plaintiff's problems with his liver, respiratory tract and blood had resolved before he was brought into the case. Dr. Dolan testified that in 1987, plaintiff suffered liver toxicity, anemia, organic brain syndrome (characterized by the balance disorder) and exacerbation of upper respiratory condition, with a possible bronchial relation. Dr. Dolan stated that plaintiff now suffers from balance disorder, organic brain syndrome and has a potential to develop leukemia. He noted that the liver test showed *479 fatty metamorphosis which is consistent with exposure to chemicals and drugs. However, there was no evidence of drug or alcohol abuse. The only incident plaintiff related to his psychiatrist of alcohol consumption was one incident in 1980, where he consumed multiple quarts of alcohol in a four day period. Because defendant was focused on the possibility that plaintiff's liver studies indicated alcohol abuse, Dr. Dolan explained that the test was not consistent with alcohol because certain liver enzymes that are normally elevated with alcohol abuse were not elevated here. Furthermore, Dr. Dolan stated that plaintiff's symptoms follow the pattern of other tested chemical exposures.
Dr. Dolan testified that plaintiff was anemic when admitted to Oschner, but that the white blood cells returned to normal after several months. He said that the neurological exams at Oschner showed a balance disorder, which is also consistent with chemical exposure and with the results of Dr. Kilburn's tests. He agreed with the diagnosis of organic brain disorder and determined that there was nothing in the records to indicate any other non-toxic cause of plaintiff's symptoms.
Dr. Dolan testified that plaintiff is at-risk for developing leukemia. He noted that the latency period is more or less twelve years. He stated that the reason that the leukemia is a risk is because benzene depresses the bone marrow, leading to anemia, which in turn causes chromosomal abnormalities in the white blood cells. Those abnormalities can become cancerous, but the cancer cannot be detected until millions of cells have been affected. As a result, plaintiff must be monitored regularly. On cross-examination, Dr. Dolan agreed that his original anemia was resolved and that the last tests he relied on were done in 1991. However, Dr. Dolan testified that the literature states that if the symptoms had not resolved by then, which they had not, then the prognosis was not good. He agreed that plaintiff's liver was normal in April, but become abnormal in June and that he was admitted to the hospital again in July 1987. Dr. Dolan did not find that inconsistent. He stated that the exposure was the best explanation. He noted that plaintiff was tender over the liver when he first went to Oschner in April, although the abnormal elevations were not noted until June. Dr. Dolan further stated that benzene is fat soluble, that it enters into the fatty tissue and stays there and that it usually goes to the brain tissue first. Defendant questioned Dr. Dolan about other hospital visits in 1985 to the V.A. Hospital during which plaintiff contended he had inhaled benzene, but was diagnosed with non-chemical upper respiratory infection. He alleged dizziness then and had a dry cough. Medical records from 1980 showed complaints of dizziness; however, it was noted this was probably related to an incident where plaintiff fell from a barge and injured his inner ear. On re-direct, Dr. Dolan noted that plaintiff has had continual problems with balance since 1987, unlike the previous incidents which were specifically related to other temporary physical problems. He also testified that plaintiff still has organic brain syndrome specifically caused by benzene, not some other chemical.
Dr. Roger Anastasio, plaintiff's treating psychiatrist, testified that he saw plaintiff in 1980 following a work related accident when plaintiff fell from the dock to the barge and into the Mississippi River. Plaintiff suffered physical injuries, but also became depressed, nervous and anxious due to his inability to return to work for several months. At that time, Dr. Anastasio diagnosed him with adjustment disorder with atypical features, such as paranoia. The doctor testified that plaintiff's problems and diagnosis related to a personality trait and not to an overt disorder. He noted that plaintiff also had a bit of grandiosity, but was not overtly delusional. Dr. Anastasio treated him with medication and therapy. He noted that plaintiff wanted to go back to work so badly that he impeded resulting in the return of the anxiety and other symptoms. Finally, plaintiff improved and the doctor saw plaintiff for the final time related to this incident in 1982, after which plaintiff returned to work.
Dr. Anastasio began treating plaintiff again in 1988 in relation to the onset of symptoms related to the exposure. Plaintiff *480 had been seeing another psychiatrist who had released him to return to work. Dr. Anastasio agreed that plaintiff suffered from organic brain syndrome. In this regard, the doctor testified that organic brain syndrome has a physical basis. When Dr. Anastasio saw him, plaintiff was extremely agitated and Dr. Anastasio changed the medications given to plaintiff by the previous psychiatrist. Plaintiff, however, continued to exhibit extreme agitation, rapid speech, difficulty in concentration, forgetfulness, confusion and depression. The differences between plaintiff's condition in 1980 versus 1988 were that in 1988 he had difficulty concentrating beyond what would be expected with the agitation, he was forgetful, his non-verbal expression of emotion was inconsistent in that he vacillated between marked happiness to marked sadness. Dr. Anastasio stated that plaintiff did not always smile or cry appropriately. He testified that this was different from the shallowness of affect in depression where a trigger causes easy crying. Dr. Anastasio noted that in 1980 the medications cleared up the symptoms and plaintiff was fine until 1987. In 1988 forward, the medications helped plaintiff cope and deal with the agitation, but did not clear up the symptoms of forgetfulness and confusion. The doctor did not believe plaintiff was acting for secondary gain.
Dr. Anastasio stated that plaintiff does not have a "personality disorder" or schizophrenia, nor was plaintiff an alcoholic. He stated that plaintiff talked to him about drinking alcohol on two occasions in reference to his frustration from the 1980 accident. The doctor explained that an alcoholic would try to hide and deny drinking, whereas plaintiff was looking for an immediate solution.
On cross-examination, Dr. Anastasio was referred to plaintiff's poor school history and habit of lying about how far he went in school and his false claim that he was a helicopter pilot in Vietnam in the Marine Corps. However, the doctor felt that this behavior was consistent with his poor self-image. The doctor stated that plaintiff would try to convince himself as much as others by making these statements.
In treating plaintiff in 1980, Doctor Anastasio noticed that plaintiff exhibited somatic preoccupation or what was once referred to as hypochondria. He noted that plaintiff had an extreme reaction to not being able to work, which was controlled by medication. In the present treatment, Dr. Anastasio stated that plaintiff has not focused on the somatic. On the contrary, the doctor stated that plaintiff's reported nausea and dizziness are directly brain related.
Dr. Cornelius Gorman, plaintiff's vocational rehabilitation expert, has a Bachelor of Science Degree in Psychology, a Master's Degree in Social Welfare and a Doctorate in Education. He tested plaintiff in 1980 by referral from plaintiff's employer. In 1980-1981, Dr. Gorman tested and saw plaintiff on seven occasions. Plaintiff came to see him again in 1988, at which time he re-tested plaintiff and consulted with him on eight occasions from October 1988 through April 1991.
In 1980-1981, Dr. Gorman stated that plaintiff showed mechanical potential (which could have helped for retraining in instrumentation technology), his problem solving skills were good (which would help in electronics), he showed a 6th-8th grade literacy capability and his I.Q. was normal at 89. During this period of time, Dr. Gorman and Dr. Anastasio first became acquainted with each other relative to plaintiff. Following his return to work, plaintiff would occasionally stop by to visit with Dr. Gorman; thus, the doctor was able to testify to plaintiff's condition over the years until the incident in 1987.
Dr. Gorman saw plaintiff again in October 1988 for re-testing. He found stark differences in plaintiff's behavior and abilities. Dr. Gorman testified that the differences he found were that plaintiff had difficulty sitting still, he sweated profusely, his concentration ability was impaired, his use of language was different, and his task approach was different. Plaintiff was also very anxious and made numerous trips to the bathroom. Dr. Gorman testified that plaintiff's inability to concentrate and sit still extended the testing from one to three days. Dr. Gorman stated that plaintiff was not malingering and was not acting due to a desire for secondary gain.
*481 Other witnesses testified to the changes in plaintiff following the April 1987 diagnosis of toxic exposure. Kary Bourg, a tankerman and a childhood and adult friend of plaintiff, testified that plaintiff mentioned that he had suffered benzene poisoning around the time he went to Oschner. Although plaintiff and he used to fish, hunt, and ski together, plaintiff began to withdraw from his friends around that time. Bourg noted that plaintiff became nervous, spoke more rapidly than normal, began to walk quickly and jerky, became forgetful and constantly contradicted himself. He testified that neither he nor plaintiff were drinkers and if they went to bars, it was to play pool.
Charles Schenck, Jr. testified that plaintiff grew up next door to him and was like a son. He stated that plaintiff got his seaman's license when he was 17 years old, was in the Marine Corps and was never a trouble maker. He noted that plaintiff was married twice. In 1989, plaintiff was in an automobile accident in which his car was demolished. That same year plaintiff moved across the street from Schenck. Because plaintiff was having financial trouble, Schenck assisted with the rent and food. Eventually, plaintiff moved to Schenck's gulf coast home, until he got on his feet. Schenck stated that plaintiff was not a "drinker". Since 1989, plaintiff exaggerates a lot, talks to himself, is sick often and complains about his liver. He turns yellow occasionally and is forgetful. On cross-examination, Schenck testified that plaintiff keeps up the lawn on the house, drives a car to shop for groceries and cooks for himself.
Lelia Naquin, another long-time friend, testified that plaintiff and she speak on the telephone almost every day and that plaintiff is a friend of her husband as well. She testified that plaintiff rarely drinks alcohol. Naquin stated that she noticed a change in plaintiff in the last four years. She stated that he is forgetful, says "off the wall things," wants to be alone and is depressed all the time. On cross-examination, Naquin stated that plaintiff has a girlfriend and that the girlfriend and Mr. and Mrs. Naquin visit plaintiff frequently. She says that he does not appear to be lonely, because he does not remember whether someone has spoken to him on the phone or not. She said that he keeps forgetting and when he drives, his mind wanders.
Gloria Mader, plaintiff's mother, also testified that he changed since the Oschner visit in April 1987. She stated that plaintiff no longer follows through on things, suffers from headaches, sleeps a lot and does not maintain his house like he did in the past. Mader said that plaintiff does not tell her everything because she has a bad heart. However, she noted that he was a workaholic prior to the onset of his symptoms in 1987 and got along with most people.
Richard Green, defendant's employee, stated that he worked with plaintiff in 1986 and 1987. He claimed that plaintiff was not any different. He asserted that plaintiff was always hyper in speech and that he always rambled.
Dr. Douglas Swift, a physician on the staff of Oschner, testified on behalf of defendant as an expert in occupational medicine and toxicology. He treated plaintiff after the initial treating doctor, Velma Campbell, M.D., left the employ of the clinic in 1987. Because the medical team discussed cases, he was familiar with plaintiff's case when he saw him in January 1988. He found plaintiff to be well-oriented with no memory deficit, but suffering from headaches, depression and anxiety from being out of work. Dr. Swift found little or no abnormalities after performing various physical and neurological tests and receiving a report from Dr. Helmet Redetski, from the Louisiana Poison Control Center. He referred plaintiff for biofeedback. In June 1988, Dr. Swift informed plaintiff that there was no evidence of toxicity from benzene and that the only long-term effect of benzene exposure was on the bone marrow. However, he refused plaintiff's request to test the bone marrow because it is an invasive procedure and was not indicated. Dr. Swift testified that he was convinced that plaintiff had psychiatric problems, but did do another blood test to reassure him. Dr. Swift relied on psychological tests given plaintiff by another psychologist, Dr. George Pursely, who stated in a report that plaintiff's possible diagnosis was either major depression, *482 somatization disorder, or schizophrenia. On June 10, 1988, Dr. Swift recommended that plaintiff return to work.
Dr. Swift testified that plaintiff did not exhibit any signs of toxicity from January to June 1988. He believed that any symptoms plaintiff might have experienced would have resolved once the product was out of his system, unless plaintiff had a high dose of benzene. He agreed that a high exposure to benzene presents a risk of leukemia. Dr. Swift testified that alcohol could result in the same symptoms about which plaintiff complained and that benzene would not make him hyperactive, but would dull him due to its anesthetic effect. He did not agree that the liver elevations signified toxicity.
On cross-examination, Dr. Swift noted that Dr. Pursely never saw plaintiff. He agreed that he never knew anyone to use one test to make a possible diagnosis of schizophrenia. He also claimed that benzene cannot be identified by smell, contrary to the weight of all of the other technical testimony. He insisted, however, that there are no scientific conclusions that relate liver toxicity to benzene exposure.
Dr. Swift's testimony was supported by defendant's other expert on occupational medicine, industrial hygiene and toxicology. Dr. Stanley Haimes reviewed the odor threshold documents and the medical records. He stated that the most common reason for the elevation in liver enzymes was alcohol use and that three alcoholic drinks would cause the elevation. He agreed with Dr. Swift that it was not possible for the liver to show high levels once plaintiff was no longer exposed to the benzene and that neither benzene, toluene or xylene is responsible for elevated liver readings. He stated that plaintiff does not have organic brain syndrome, which is not associated with benzene, but with other chemicals in amounts not found in the work environment. He testified that an acute exposure to benzene would result in death or recovery with no ill effects. He believed that the pins in plaintiff's ankle would cause balance problems and that the 1980 fall could be responsible for plaintiff's on-going dizziness. He disputed other results of the testing performed by Dr. Kilburn. Dr. Haimes also stated that the event at the Koch-Ellis barge ten days before plaintiff went to the Oschner Clinic could have been the triggering event for plaintiff's focus on chemical exposure.
On cross-examination, Dr. Haimes stated that he did not read reports generated by one of defendant's experts who was not brought to trial, that said liver insult can be a result of toxic exposure to benzene. He could not explain why the E.M.G. was abnormal and was unable to dispute that the textbook he used in school lists all of plaintiff's symptoms as associated with benzene exposure. Dr. Haimes disagreed with studies linking benzene with leukemia and insisted that benzene cannot be detected by odor.
Dr. Herman Colomb is a psychiatrist who treated plaintiff on referral from Dr. Swift. He saw plaintiff on nine occasions from November 1987 to August 1988. Plaintiff complained of "empty-headedness," apathy, fear of driving, reluctance to associate with anyone and episodes of depression. Plaintiff also claimed that he had been suffering from gastrointestinal distress, headaches, dizziness and light-headedness. Dr. Colomb treated plaintiff with medicine, but said that plaintiff should stop taking the pills if he experienced side effects. Dr. Colomb testified that plaintiff went to another psychiatrist because he felt that plaintiff could work, but plaintiff did not. He stated that plaintiff did not like the office job provided him and that was the reason he did not continue to work. It was Dr. Colomb's opinion that plaintiff was somatic (or a hypochondriac) and focused on every little physical problem. Dr. Colomb related plaintiff's claims of dizziness to an ear problem, not organic brain syndrome. He also said plaintiff focused on benzene and was worried that something was wrong with him. Dr. Colomb did not find that plaintiff had any problems with memory or concentration. He diagnosed plaintiff with chronic anxiety and depression, but felt that plaintiff was able to return to work.
Proof of causation, but not defendant's fault, is at issue here. The standard of review by this court of the finding by the trial judge on causation is whether or not the trial judge was clearly wrong, or manifestly *483 erroneous. In this regard, the Louisiana Supreme Court has recently stated:
In Arceneaux v. Domingue, 365 So.2d 1330 (La.1978), this Court held that the court of appeal should not upset the factual findings of a trial court absent manifest error or unless clearly wrong. A proper review, therefore, cannot be "completed by reading so much of the record as will reveal a reasonable factual basis for the finding in the trial court; there must be a further determination that the record established that the finding is not clearly wrong." Id. at 1333. More recently, regarding this constitutional appellate review of fact in civil cases, La. Const. art. 5, Sec. 10, we have had occasion to say in Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), a case which involved the review of damages, that "the discretion vested in the trier of fact is `great,' and even vast," and in Stobart v. State, 617 So.2d 880, 882-83 (La.1993), which involved the standard of review of findings of fact, a "court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of `manifest error' or unless it is `clearly wrong,'" and "where two permissible views of the evidence exists, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." Id. In each of these cases there was but a perpetuation of the principle set down in Arceneaux.

Notwithstanding the Court's earlier guidance to reviewing courts in Stobart v. State through DOTD, 617 So.2d 880 (La. 1993), it was not our purpose in that case to mandate that the trial court's factual determinations cannot ever, or hardly ever, be upset. Although deference to the factfinder should be accorded, the court of appeal, and the Louisiana Supreme Court, nonetheless have a constitutional duty to review facts. Of course, the reviewing court may not merely decide if it would have found the facts of the case differently. Rather, notwithstanding the belief that they might have decided it differently, the court of appeal should affirm the trial court where the latter's judgment is not clearly wrong or manifestly erroneous ...
Ambrose v. New Orleans Police Dept. Ambulance Service, 93-3099 (La. 7/15/94), 639 So.2d 216, 220, 221.
The trial judge here concluded that plaintiff bore his burden of proving by a preponderance of the evidence that plaintiff suffered organic brain syndrome, with various accompanying symptoms, from exposure to benzene concentrate at the defendant's facility. In reaching this conclusion, the trial judge relied on the testimony of plaintiff's witnesses. Her choice was based on reasonable credibility determinations. After our review of the evidence we find that the trial judge was not manifestly erroneous in relying on the testimony of plaintiff's experts. In addition, we find no merit to defendant's assertion that plaintiff judicially admitted his injury was caused by the incident of the closed barge ten days before the Oschner visit. The matter was gone into in great detail during the trial and was a matter to be considered by the trial judge along with the other evidence. And she still found in favor of plaintiff. We note that the law does not require plaintiff to prove that the act of defendant was the sole cause of the injury. After our review of the evidence, we find that the trial judge was not clearly wrong in determining that plaintiff suffered injuries which were caused by exposure to benzene at defendant's facility.

COMPARATIVE NEGLIGENCE
Defendant asserts that the trial judge erred in failing to find plaintiff comparatively negligent. We have reviewed the evidence and find no support for this position. Thus, we find that the trial judge did not err in not finding plaintiff comparatively at fault.

EMPLOYER'S FAULT AND CROSS-CLAIM
Defendant also contends that the trial judge erred in refusing to allow defendant to cross-claim against plaintiff's employer, Hollywood Marine, and in failing to assess fault against plaintiff's employer.
Defendant filed a cross-claim by virtue of a rule to show cause. No hearing was held because defendant failed to pay the cost for the hearing. Two weeks before trial, at a *484 hearing on an unrelated matter, defendant asked the trial judge for a ruling. At that time, the trial judge noted that defendant had failed to pay the costs for the hearing and then denied the motion because it was too close to the trial date. She then stated that she would decide the matter at the end of the trial. However, the judgment was silent on this matter and we presume that the trial judge implicitly denied the motion since she found defendant solely negligent. Furthermore, we find that defendant was not prejudiced by the trial judge's refusal to allow the cross-claim or find the employer at fault, because the evidence at trial does not support any degree of employer fault. The testimony of both Hollywood Marine employees and defendant's employees show that defendant was responsible for safety on the dock. Furthermore, the evidence does not support a finding that plaintiff's injuries may have been caused by the closed barge incident ten days before he went to Oschner for his continuing flu symptoms. Plaintiff had been suffering these symptoms long before he went into the Koch-Ellis barge. Although plaintiff's trial testimony and deposition testimony varied, there was no evidence that the enclosed barge contained any chemical residue that could be considered a possible source of plaintiff's chemical exposure. Notably, plaintiff was ordered into the barge to view the patched area. Since the barge had already been repaired by the Koch-Ellis workers, it was highly unlikely that any chemical remained inside. Consequently, we find that the trial judge did not err in refusing to permit defendant to file its cross-claim or in failing to find Hollywood Marine, plaintiff's employer, at fault in any degree.
GENERAL DAMAGES AND FUTURE WAGES:
Plaintiff stated that he has lost forty pounds since 1987, lost friends at work, is not able to concentrate, is depressed and cannot "maneuver." He testified that he had no prior history of psychiatric problems prior to his treatment in 1980. However, he felt that Dr. Anastasio's treatment has helped him to cope. Although he drives when necessary, he stated that driving makes him nervous and he finds it exhausting. He stated that he wants to be himself again.
Dr. Anastasio stated that plaintiff is unable to drive presently. He also stated that one of plaintiff's problems is that he cannot accept the fact that he is not going to return to what he used to be. He wants to return to work on the river and he had pride in the work he performed. It was one of the few things he felt good about and was essential to his self-esteem. Notably, plaintiff had two failed marriages. However, the doctor believes that plaintiff is not going to get better or be able to return to work.
Dr. Anastasio testified that plaintiff is getting the best treatment that he can provide for this condition. He stated that he did not envision the organic brain syndrome improving. Thus, he is not sure that plaintiff can return to any type of job and deferred to the vocational rehabilitation expert on this matter. Dr. Anastasio has added cerebral electrostimulation with a TENS unit to plaintiff's medications and therapy treatment to help the agitation, headaches and insomnia. This treatment injects small dosages of electricity at a low frequency to the brain to encourage the alpha rhythms. The doctor said that this is similar to hypnosis and meditation.
Dr. Anastasio stated that at one point, plaintiff was referred to New Medico Rehabilitation Center in Folsom, Louisiana as an out-patient, but plaintiff was unable to become adjusted to that circumstance. Plaintiff stated that he stayed thirty days. Toward the end of 1991, plaintiff talked about suicide. After being placed on an anti-depressant, he settled down. Since then, plaintiff has been placed on various medications and the doctor foresees reducing the frequency of visits. He notes that he will see plaintiff to help him deal with his feelings and to monitor the Alpha-Stim and medications.
Dr. Gorman stated that plaintiff was not approved to drive, but did so on occasion. Based on his testing and Dr. Anastasio's opinion, Dr. Gorman stated that plaintiff would not be able to return to work because of his difficulty in focusing, his anxiety with depression and inability to give attention to detail. Dr. Gorman stated that plaintiff will need supervisory in-home care and at one *485 point, plaintiff was referred to New Medico Injury Center on the advice of Dr. Anastasio. Dr. Gorman also investigated a Life Care Plan from New Medico at the request of Dr. Anastasio. At New Medico, the patient is retrained from the ground up with the assistance of a multi-disciplinary team approach. Dr. Gorman stated that the purpose of sending plaintiff to New Medico would be to try to effect cognitive retraining and set a base for medication management. He stated that this approach would require a minimum of six months in-house and another six months if the patient developed some predictable degree of success. Alternatively, plaintiff might require simple custodial care at a halfway house, with no treatment.
Dr. Gorman was given a list of jobs that was prepared by Nancy Favalora, defendant's vocational rehabilitation expert. Two dispatcher jobs were listed. Dr. Gorman stated that plaintiff cannot compile a log, communicate adequately, relate to people or sit still. It was noted that plaintiff attempted to work for three days in the office of Hollywood Marine, but was unable to adjust to that position. An automobile salesman was also noted by Dr. Favalora, but Dr. Gorman stated that plaintiff would not be able to compete on a commission basis with other salesman for the above reasons. He stated it was the same with the Customer Service Representative. Dr. Gorman stated that plaintiff might be able to function as an embroidery machine operator, but there might be a problem with his safety because of the medications he was taking. Dr. Gorman testified that the telephone solicitor job is extremely stressful, but he would defer to Dr. Anastasio. He noted, however, that these jobs are usually part-time and many are paid by commission. The alarm monitoring job requires strict attention to detail and has a fairly high stress level. The toll collector position is not within his educational limits and has a lot of applicants because of the relatively good pay. He stated that he could recommend this if his medications could be stabilized, but did not believe Dr. Anastasio would approve this position. On cross-examination, Dr. Gorman stated that he did not disagree with the job list, but felt that plaintiff had not reached a level of performance that would give predictability of success. Furthermore, he noted that Dr. Anastasio has not released plaintiff for return to work. When Dr. Anastasio said that plaintiff was able to work, Dr. Gorman said he would institute a job search.
Dr. Gorman was examined on plaintiff's symptoms from his 1980 accident. However, Dr. Gorman explained that plaintiff got better and returned to work. He noted that there was a 10% disparity between plaintiff's I.Q. in 1980 and 1988, but was still within normal range. He testified that plaintiff's productivity dropped off due to his lack of perseverance, focus and command of his faculties. Dr. Gorman noted that plaintiff wavered under stress in 1988. In addition, plaintiff had trouble with problem solving. Plaintiff was unable to complete the test a second time and got frustrated and confused. Dr. Gorman noted that grandiosity is one of plaintiff's personality traits, but he does not consciously lie. The doctor stated that plaintiff is unemployable because of all of the above factors.
Nancy Favalora, defendant's expert in vocational rehabilitation, job market analysis and job placement, testified that she saw plaintiff in November 1991. She stated that plaintiff communicated smoothly, read at the tenth grade level, but was unable to complete the math test because of a headache. Favalora then used the New Medico tests results and the medical records. She concluded that plaintiff is not so deficient that he cannot return to work. She felt that he has skills that can be transferred, such as tool familiarity, that he can work alone, has barge familiarity and high test scores. She noted that he had to concentrate to complete the tests for Dr. Gorman and New Medico. She went over the suggested jobs, which Dr. Gorman disputed. She noted that her company helps the worker by assisting with the application and interview process. Favalora stated that even plaintiff's poor memory can be helped by using lists and other devices.
On cross-examination, she noted that Dr. Gorman's tests were accompanied by a psychiatrist report and that her expertise does not permit her to administer or interpret *486 psychological tests. Further, she did not review the deposition of Dr. Kilburn, Dr. Dolan or Dr. Anastasio. She agreed that plaintiff's ability to work depends on his medical condition.
Defendants also produced the testimony of two private investigators, Bob Eubanks and Keith Lobrono. Neither testimony showed any significant activity that would impeach the testimony.
Both parties produced the testimony of expert economists. Both experts used a future work life figure of 15.2 years. George Rice testified for plaintiff. He produced a figure of $185,636 in past lost earnings based on an annual income of $32,497, which included the first four months of 1987 and value for fringe benefits. Using a six and one-half discount with 4% growth factor, Rice stated that plaintiff's loss of future income was $409,705.
Defendant's economist was Kenneth Boudreaux. He used a six and one-half percent discount rate. Assuming plaintiff is totally disabled and using annual wage figure of $22,000, he calculated past wages at $133,287 and future loss of wages at between $247,735 and $301,763. Assuming plaintiff could work at the minimum wage, Boudreaux stated that the future loss wages would be between $151,287 and $184,280. Boudreaux stated that plaintiff would lose between $123,868 and $150,882, if he could earn 50% of his previous wage.
Defendant asserts that the trial judge abused her discretion in her award of past and future lost wages and general damages. It also asserts that the trial judge awarded some amount for fear of cancer when there was no testimony on this point. Plaintiff asserts that the award for general damages is inadequate.
In reviewing an award of damages, the appellate court is limited to a review for abuse of the trier of fact's great discretion. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993). In regard to lost wages, the trial judge accepted the testimony of Rice. She also accepted the testimony of plaintiff's witnesses that plaintiff is totally disabled from working. After our review, while we find little evidence of fear of cancer, the risk of plaintiff's getting leukemia was well documented by the testimony. In addition, we find no manifest error in her finding that plaintiff is totally disabled and no abuse of her great discretion in her award of past and future lost wages. Likewise, we find no abuse of the trial judge's discretion in her award for general damages.

PLAINTIFF'S APPEAL

EXEMPLARY DAMAGES:
We have already addressed plaintiff's appeal of quantum. However, plaintiff also argues that the trial judge erred in failing to award exemplary damages. Exemplary damages are recoverable under La. C.C. art. 2315.3 when plaintiff proves that his injuries "were caused by the defendant's wanton or reckless disregard for public safety in the storage, handling, or transportation of hazardous or toxic substances." The trial judge determined that defendant's conduct was not wanton or reckless. The evidence supports this finding. Defendant followed the OSHA standards and performed monitoring of the benzene levels. Although it was argued that the standards were too low and the monitoring was too infrequent to adequately warn of excess vapors escaping from the vents, sump and pipeline, defendant was not wanton and reckless in the handling of the product. Thus, we find that the trial judge did not err in failing to award exemplary damages.

INTERVENOR'S RESPONSIBILITY FOR ATTORNEY FEES AND COSTS:
Plaintiff cites Moody v. Arabie, 498 So.2d 1081 (La.1986) to support his argument that the intervenor is responsible for sharing the costs of litigation because the intervenor reaped the benefit of plaintiff's litigation expenses. Moody stands for that proposition in relation to an intervenor who paid workers' compensation under the Louisiana scheme. It does not apply to the intervenor who paid compensation to the plaintiff under the Longshore and Harbor Workers Compensation Act. (LHWCA), 33 U.S.C. § 901, et seq.
*487 In Bloomer v. Liberty Mutual Insurance Co., 445 U.S. 74, 100 S.Ct. 925, 63 L.Ed.2d 215 (1980), the United States Supreme Court rejected, as contrary to the LHWCA, a demand that the employer bear a proportionate share of the employee's expenses after the plaintiff has been successful in the third-party action. See also: Peters v. North River Ins. Co., 764 F.2d 306, 311 (5th Cir.1985); Villanueva v. CNA Insurance Companies, 868 F.2d 684, 686 and 687 at fn. 4 (5th Cir.1989). However, as explained in Bartholomew v. CNG Producing Co., 862 F.2d 555, 559 (5th Cir.1989), there is an exception when plaintiff's net recovery is not much more than, or, is less than, the compensation paid. Under that circumstance the court may apportion the attorney fees to allow plaintiff to obtain some recovery. Since the latter situation does not exist here, we are bound by the decision in Bloomer. Consequently, we find that the trial judge did not err in refusing to assess a proportionate share of plaintiff's attorney fees and costs against the intervenor.
Accordingly, the judgment of the trial court is hereby affirmed.
AFFIRMED.
GAUDIN, J., dissents with reasons.
GAUDIN, Judge, dissents with reasons.
At issue in this appeal is Shell Oil Company's serious contention that it was denied its right to a civil jury in the Twenty-Ninth Judicial District Court. Following the trial judge's refusal to permit a jury, a bench trial ensued, resulting in a monetary award to plaintiff-appellee Harold A. Manuel.
Under the particular circumstances of this case, it appears that Shell's request for a jury was wrongly denied; consequently, I would void and set aside the February 2, 1994 judgment in Manuel's favor and remand for a trial by jury.
These are the procedural facts:
On April 13, 1988, Manuel filed this tort suit demanding a jury trial. He alleged physical and emotional injuries from exposure to benzene concentrate. The pleading did not contain an order for the judge to sign either setting the amount of a bond or the time for posting of the bond.
In two subsequent filings of amending and supplemental petitions, on September 11, 1989 and again on January 17, 1990, Manuel specifically asked for trial by jury. In another amending and supplemental petition filed on October 30, 1991, Manuel did not specify a jury trial but he did pray for "... any and all other relief previously requested."
On January 8, 1991, the trial judge ordered a "... trial by civil jury ... for the weeks of November 4 and November 11, 1991." Apparently, the trial judge was not presented with an order setting either the amount of the jury bond or the time for filing of the bond. There was, therefore, no compliance with LSA-C.C.P. art. 1734, which provides for the fixing of the bond in civil jury cases. The article states:
"... when the case has been set for trial, the court shall fix the amount of the bond to cover all costs related to the trial by jury and shall fix the time filing the bond. Notice of the fixing of the bond shall be served on all parties. If the bond is not filed timely, any other party shall have an additional ten days to file the bond."
On July 30, 1991, the trial was continued from November 4-13, 1991 and reset for February 3-7, 1992.
On December 11, 1991, Manuel filed a motion to recuse the trial judge, Joel T. Chaisson. Judge Chaisson had advised all litigants that he owned interests in several companies doing business with Shell. On December 18, 1991, Judge Chaisson recused himself and the case was reallotted to Judge Mary Ann Lemmon.
On November 13, 1992, in a "Pre-Trial Order" signed by Manuel's attorney and other counsel, this is stated:
"Plaintiff estimates it will take one day to pick a jury and that it will require five days for him to complete presentation of his case in chief."
Also on November 13, 1992, the trial was scheduled for March 8, 1993. Again, there was no compliance with Art. 1734 regarding the setting of the bond and the time for filing *488 the bond because, apparently, an appropriate jury bond order was not submitted to the trial judge.
On February 12, 1993, Manuel deposited $3,426.00 into the registry of the court to pay for subpoenas and subpoenas duces tecum.
At a status conference on February 17, 1993, Manuel's attorneys for the first time gave oral notice that the plaintiff was waiving his right to a jury trial. Shell, seeking a jury, filed a jury order the next day, February 18th, and at the same time posed (1) a cash bond of $2,500.00 to cover costs of five jury days and (2) the jury empaneling fee of $1,000.00. The trial judge denied Shell's request, saying that because Manuel had never perfected his request for a juryi.e., he had not posted a bondhe could orally, with the trial date three weeks away, back off from his repeated demands for a jury trial.
This seems to be in violation of LSA-C.C.P. art. 1733(B). The entire article reads:
"A. A party may obtain a trial by jury by filing a pleading demanding a trial by jury and a bond in the amount and within the time set by the court pursuant to Article 1734.
"B. A motion to withdraw a demand for a trial by jury shall be in writing.
"C. The pleading demanding a trial by jury shall be filed not later than ten days after either the service of the last pleading directed to any issue triable by a jury, or the granting of a motion to withdraw a demand for a trial by jury."
Although the amount of the jury bond was never set, perhaps inadvertently, and although Manuel did not post a bond, he nonetheless demanded a jury in at least three pleadings, including the original petition; and as the trial progressed from April 18, 1988 until November 17, 1992, he over and over gave every indication, to the trial judge and to Shell, that his demand for a jury was ongoing. By more than adequately complying with the first (and major) portion of Art. 1733(A), Manuel activated Art. 1733(B), which says that a motion to withdraw a demand for a trial by jury shall be in writing. There is no statutory requirement for the posting of a bond before Art. 1733(B) is triggered.
In the interests of fairness and justice and in line with intent of the legislature in wording Art. 1733, I would hold that if a party, in conformity with Art. 1733(A), formally (in pleadings) demands a trial by civil jury and if the trial judge subsequently signs an order directing a trial by jury, the party requesting a jury must file a written notice, as Art. 1733(B) mandates, to effectively withdraw the jury demand.
Following denial of its jury request and before the bench trial, Shell unsuccessfully sought supervisory writs. Manuel argues that the denial of Shell's jury demand became the law of the case when certiorari was denied by this Court on March 4, 1993 with the following notation:
"On the showing made, we find no error of law or abuse of the trial judge's discretion; thus, we find no need to exercise our supervisory jurisdiction."
The right to a jury trial is fundamental and constitutional and is so significant that a writ denied of this right cannot become the law of case. The issue can be reconsidered on appeal. See Sharkey v. Sterling Drug, Inc., 600 So.2d 701 (La.App. 1 Cir.1992), wherein the court said this at page 705:
"The `law of the case' principle embodies the rule that an appellate court ordinarily will not reconsider its own rulings of law in the same case. Glenwood Hospital, Inc. v. Louisiana Hospital Service, Inc., 419 So.2d 1269, 1271 (La.App. 1st Cir.1982). The doctrine is a discretionary guide and is not applicable in cases of palpable error or where, if the law of the case were applied, manifest injustice would occur. See Landry v. Aetna Insurance Company, 442 So.2d 440 (La.1983); Glenwood, 419 So.2d at 1271. Although we find no palpable error or manifest injustice in the denial of a jury in this case, we are mindful of the fact that the right to a jury is fundamental and all doubts must be resolved in favor of its exercise. Block v. Fitts, 259 La. 555, 250 So.2d 738 (1971)."
In suggesting a remand, I am not saying that Manuel was not negligently exposed to *489 benzene concentrate or that he is not entitled to sizable damages. I would affirm the award to Manuel absent the jury issue. I say merely that Shell's right to a jury trial was erroneously denied.

REHEARING DENIED.
This court has considered the recent Louisiana Supreme Court case of Department of Transportation & Development v. Walker, 658 So.2d 190 (La.1995) and this circuit's decision in Vincent v. Dodge, 652 So.2d 84 (La.App. 5th Cir.1995). We find neither Walker nor Vincent to be dispositive here, as those cases are factually dissimilar. We further find no other basis upon which to grant the rehearing in this case.
NOTES
[1] A copy of the rules of the district court were part of the writ application, 93-C-159 (La.App. 5th Cir. 2/25/93), filed by defendant on the same issue, which a panel of this court denied.